ELVIRA M. ALDRICH ET AL., APPELLEES, V. MARANDA J. STEEN ET AL., APPELLANTS.[*]

FILED FEBRUARY 4, 1904.   No. 13,172.

1. **Evidence: DEEDS: MARRIAGE: VALIDITY.** Evidence *held* not to show such total want of understanding, or such mania, affecting the transactions in question, as to avoid the deeds and marriage of Seth F. Winch for insanity, in the absence of fraud or undue influence.

2. ———: ———: UNDUE INFLUENCE. Evidence *held* sufficient to avoid, for undue influence, the deeds concerning all his property, of the value of many thousand dollars, made by a frail old man, who had shown symptoms of dementia, to his housekeeper, without consideration.

3. **Statute of Limitations.** Where the undue influence is alleged and shown to have continued to the grantor's death, 7 years later, only interrupted by his violent insanity toward the last, and the control of both person and property of the grantor lasted to the end, the statute of limitations against an action to set aside the deeds will not commence to run until his death as against his heirs.

4. **Marriage: MENTAL CAPACITY.** Mental weakness or even unsoundness, not proceeding to the extent of inability to contract in ordinary affairs, will not alone avoid a marriage.

5. **Divorce: DECREE: COLLATERAL ATTACK.** A decree of divorce obtained without collusion by a defendant on a cross-bill in a suit begun in a county where neither party resided, but by a resident of the state, whose motion to dismiss the cross-bill for want of

---

[*] Rehearing allowed. See opinion, p. 57, *post.*

jurisdiction was denied, and who contested its allowance at the trial but took no appeal, is not open to collateral attack by his heirs in claiming his property.

APPEAL from the district court for Douglas county: CHARLES T. DICKINSON, JUDGE. *Decree modified.*

*W. A. Saunders, W. F. Wappich* and *Smyth & Smith,* for appellants.

*Thomas & Nolan, contra.*

HASTINGS, C.

This is an appeal from Douglas county. April 21, 1902, plaintiffs, two of whom were daughters and the third a granddaughter of Seth F. Winch, commenced suit, alleging their relationship; that he died February 11, 1899, at the hospital for insane at Council Bluffs, at the age of 77 years; that plaintiffs are his sole heirs; that the defendant Maranda J. Steen claims to have been Winch's wife at the time of his death, and has since married John J. Steen, who is joined as defendant, for that reason; that the other defendants claim to have acquired an interest in the land involved through Maranda J. Steen; alleged that Winch died seized of the real estate described, situated in Douglas county, and also of lots in the city of Chicago, and also of certain lands in Minnesota and of lots in Council Bluffs, Iowa; that on April 22, 1892, Winch conveyed to Mrs. Steen, then known as Maranda J. Mitchell, by warranty deed all of the real estate, except some lots in Council Bluffs and one lot in Chicago; that on April 25, Mrs. Mitchell reconveyed to him by warranty deed the same property, and on May 10, 1892, Winch by warranty deed again conveyed to her the real estate in Douglas county, subsequently caused to be conveyed to her the property in Chicago and in Council Bluffs, and in 1893, through one Foster, conveyed to Mrs. Steen the lands in Minnesota. That in 1900 Mrs. Steen conveyed a portion of the property to Alfred J. Norman, and in 1901 another portion to

George F. Morton, who on the same day conveyed to the defendant Gates, and afterwards, in the same year, she conveyed another portion of the property to George F. Morton, who conveyed it to the defendant, Mae L. Rice; that in 1902 Mrs. Steen and her husband conveyed to Mae L. Rice another portion of the property. It is alleged that each of the grantees in these conveyances took them with full knowledge of plaintiffs' rights; it is alleged that no title was conveyed by these several deeds, because the grantees knew of the insanity of Seth F. Winch and of his incapacity to convey, and, consequently, of the invalidity of Mrs. Steen's title. It is also alleged that by a sheriff's deed of December 20, 1894, the east one-fourth of lot 16, in Hawes' addition to the city of Omaha, was conveyed to Mrs. Winch for a consideration paid from the money of Seth F. Winch, procured from him when he was insane and acting under the undue influence of Mrs. Steen. It is alleged that in May, 1888, Maranda J. Mitchell took up her abode in Winch's house, first as a lodger and presently as a housekeeper, and remained with him until his death in 1899, in a state of illicit cohabitation and adultery; that she was 40 years of age when she came and Winch 66; that they lived together as man and wife, and were so reputed; that she was strong mentally and physically and a woman of prepossessing appearance; that Winch was feeble, and of feeble and unsound mind; that she acquired, and always retained, a great influence over him; that he was the owner of property to the value of about $100,000 in 1888, almost all of which was from time to time transferred to her; that, during all of the time of their connection, Winch continued in poor health and his mental powers weak; that he remained in this condition until in 1896 a complaint was filed at the instance of Mrs. Steen, charging him with insanity, and in 1898 another, on which the board found he was insane, and he was removed to St. Bernard's hospital in Council Bluffs, where he died, wholly insane; that when the conveyances to Mrs. Steen were made, he was incapable of understanding the nature

of the act and of making of deeds; that he was then mentally incapable of remembering the proper objects of his affection; that he was *non compos mentis,* did not understand the effect of his action and did not have mental capacity to transact ordinary business; that the deeds were induced by undue influence of Mrs. Steen; that, while they were living together in the state of adultery, she procured, besides these conveyances of real estate, mortgages, notes, moneys and securities without any consideration; that Mrs. Steen then had no income or property, and had worked at the trade of dressmaking; that she was assisted in procuring these conveyances by the family physician, Dr. Von Lackum; that, at the time of the first conveyance of real estate, April 25, 1892, there was pending and on trial, in the Cass county district court, a divorce suit, originally instituted by Winch, but in which his wife had filed a cross-bill and was asking alimony; and Mrs. Steen and Dr. Von Lackum procured the conveyance, by representing that it was necessary to prevent the wife from obtaining the property as alimony; that she fraudulently represented that the wife and the lawyers in the case would take the property from him, and he would have nothing left, unless it was conveyed to Mrs. Steen; that, before the making of the conveyances to Mrs. Steen, he had declared his intention to leave his property to his children, that, after the making of the deeds, he declared the property was his as much as it had ever been; that he was, and Mrs. Steen knew he was, easily influenced and deceived, and that Mrs. Steen procured these conveyances with full knowledge of his lack of mental capacity, and designing to defraud plaintiffs; that on May 16, 1892, she procured him to obtain a license and enter into the marriage relation with her; that the decree of divorce was rendered April 30, 1892, and the pretended marriage was therefore bigamous and void, and Winch, at that time, totally incapable of entering into a marriage contract; that the divorce action was filed by Winch in Cass county, Nebraska, against his wife, who resided in Providence, Rhode Island;

that neither party to the action had any residence or citizenship in Cass county, and the court acquired no jurisdiction over the person of either of said parties or the matter of said action; that the decree of divorce of April 30, 1892, in Cass county, was wholly void, and the parties never lawfully divorced, and the marriage to Mrs. Steen bigamous; that since January 1, 1897, Mrs. Steen had received all the rents and profits of the premises described in the petition, to the amount of $10,000.

Plaintiffs ask that the deeds be canceled and adjudged void; that title to the land be quieted in them, as heirs of Winch, and possession delivered; that the decree of divorce in Cass county be declared void, and the pretended marriage of Winch and Mrs. Steen set aside, and the defendants each enjoined from making any disposition of, or interfering with, the real estate, and that the defendants be required to account for the rents and profits since January 1, 1897.

Maranda and John J. Steen answered, admitting Winch's death on February 11, 1899; admitting the marriage of May 16, 1892, and that the parties lived together as husband and wife until Winch's death, and admitting the marriage to Steen; denied that Winch died seized of any of the property, and denied that in 1888 he owned property of the value of about $100,000; admit the making of the deeds of May 10, 1892, to the Omaha property, but deny the conveyance of the property in Chicago and in Council Bluffs; admit the conveyance by Foster and wife to Mrs. Steen of the land in Pine county, Minnesota, and of lot 9, block 4, Hoppe's Bonanza, an addition to the city of South Omaha, and admit the sheriff's deed as alleged to Mrs. Steen of the last described property; admit its conveyance to Norman, and say that she owned lot 22, block 12, in Brown's Park addition, since September 14, 1889, when she bought it from Winch for $500; that the deed of April 22, 1892, was never delivered to her, and the deed back of April 25, 1892, was made to reconvey the legal title to Winch, and, by mistake, included lot 22, in block

12, Brown's Park, which was never intended to be conveyed. The conveyance to Morton, and by Morton to Gates, is admitted; the conveyance to Mae L. Rice is also admitted; the defendants say that the deed of May 10, 1892, by Winch to Mrs. Mitchell was in payment of $1,250, and as consideration for an agreement between the parties of May 9, 1892, and the further agreement of May 10, that Winch was to transfer his property to Mrs. Mitchell and she was to marry him; that the written agreement was that she should take care of him during the remainder of his life, if she should outlive him, and attend to his burial, he to deed her such property as he wished her to have, in consideration of her services; that she had resided upon two of the lots in Omaha ever since her marriage with Winch, and was the owner and in absolute possession of the unconveyed portions of the real estate described in Douglas county, Nebraska, in Council Bluffs, in Chicago and in Minnesota; that Winch was of sound mind and memory, and in good bodily health, until 1896; that no undue influence was used to induce his making the deeds and delivery of property; admit her taking employment as Winch's housekeeper in 1888, and acting as such until the marriage with him on May 16, 1892, and deny any adulterous cohabitation; they deny the procuring of any complaint of insanity against Winch, and deny any request to reconvey the property; admit that Winch himself commenced the action in Cass county for divorce from his wife, and say that she appeared, and on her cross-bill a decree of divorce and alimony in the sum of $15,000 which was fully paid by Winch, was procured.

The answer further alleges conspiracy of Norman and the plaintiffs to institute this action and deprive her of her property. The answer also complains of misjoinder of the claims of insanity and of undue influence by the plaintiffs, and pleads that the alleged cause of action did not accrue within four years before the commencement of the suit and that it is barred by the statute of limitations. They ask a dismissal of the case.

Gates and wife answered, claiming a conveyance of lot 19, Winch's subdivision, an addition to the city of South Omaha, from Geo. F. Morton, August 17, 1901; that Morton bought the property of Mrs. Steen for $1,500, and conveyed it to Gates for the same amount; that the latter had no knowledge or information of any insanity or incapacity on Winch's part, and say that he was of sound mind on May 10, 1892, when he deeded the property to Mrs. Mitchell; these defendants also set up misjoinder, and also allege that plaintiffs' cause of action did not accrue within four years and was barred.

A similar answer was filed by Mrs. Rice and husband as to the property conveyed to them by Morton. Replies were filed, consisting of general and special denials.

Trial was had January 15, 1903, and decree entered for the plaintiffs. The court found generally for the plaintiffs. Found that Winch died in 1899, and that plaintiffs are his sole heirs, and that the mother and grandmother, Sarah Winch, was Seth F. Winch's wife, and died in June, 1898; that Winch in 1891 filed his petition in Cass county district court for a divorce from her; that she filed an answer and cross-petition for divorce; that April 30, 1892, she was granted a divorce upon her cross-petition; that it appears from the pleadings and record in this case that neither party ever resided or had any citizenship in Cass county, and that the district court of that county therefore had no jurisdiction, and the decree of divorce was wholly void; that Winch owned the real estate described, on May 10, 1892, and that he conveyed it to Mrs. Steen; that on June 1, 1893, he owned the property in Pine county, Minnesota, and conveyed it to Foster and wife, and they quitclaimed to Mrs. Steen, all without consideration, Foster acting merely for the purpose of conveying title to Mrs. Steen; that August 24, 1894, Winch procured a conveyance to be made to Mrs. Steen of a lot in Chicago, on which he had previously held a mortgage, and had this done without any consideration moving from Mrs. Steen; that in the same year, 1894, Winch procured a mortgage

to be foreclosed and the sheriff's deed to be made, conveying to Mrs. Steen, without consideration, lot 16, in Hawes' addition to the city of Omaha; that Winch died seized of lot 22 in block 12, Brown's Park, and that the same descended to the plaintiffs at his death, and that Mrs. Steen had no interest in it; that on May 9, 1892, and thereafter till his death, Winch was insane; and that all of the conveyances made by or under his direction to Mrs. Steen conveyed no title and were void, and should be delivered up and canceled of record; that Winch and Mrs. Steen went through the ceremony of marriage May 16, 1892, but that he was then insane and incompetent to enter into any marriage contract; that Sarah Winch was then his wife, and the Cass county court was without jurisdiction, and its judgment void; and that the attempted marriage was wholly void, and that no marriage between the parties was ever effected or consummated, by conduct or otherwise; and that Mrs. Steen acquired no interest, dower or title to Winch's estate because of such marriage. The court further finds that Mrs. Steen's alleged interest had been conveyed to Norman, Morton, Gates and Rice as alleged, but that each of them had notice of Winch's insanity at the time he conveyed the property to Mrs. Steen, and that all their deeds were void and should be delivered up and canceled. The court finds that the conveyances of lot 9, block 4, Hoppe's Bonanza, to Mrs. Steen, through Foster and wife, were void and should be canceled as a cloud over plaintiffs' title to that property. The court finds that the rents and profits of the premises from April 18, 1898, to the date of the decree were $9,314.03; that Mrs. Steen had made improvements upon the property since April, 1899, to the amount of $7,783.34; that she paid taxes amounting to $1,530.69; that the improvements and taxes were paid out of the rents, and that she was entitled to offset them; that Mrs. Rice had made valuable improvements to the amount of $169.11; that Gates' improvements to the value of $11.84 should be paid for by plaintiffs; that all of the defendants should be perpetually enjoined

from conveying, incumbering or interfering with the real estate, and that the title of plaintiffs should be quieted as against the defendants; and defendant Maranda J. Steen should forthwith convey to plaintiffs the real estate in Pine county, Minnesota, and in Cook county, Illinois, and turn over to plaintiffs the possession thereof. A decree was entered in pursuance to these findings. The parties, however, do not bring error, but have entered an appeal in this court.

Appellees say that the issues are: (1) Was Winch insane when he executed all of the deeds to Mrs. Mitchell, and when he attempted to marry her, and were the deeds and marriage void on that account? (2) Were the conveyances without consideration, and procured by Mrs. Mitchell by undue influence exercised through illicit sexual intercourse? (3) Was the divorce at Plattsmouth void for want of jurisdiction over the subject matter, and lack of consent on the part of the state; and was the marriage of Winch and Mrs. Mitchell consequently void, he being admittedly insane at the time his first wife died in 1898?

Practically the question is, was Winch insane on and after May 10, 1892, till the time of his death, as the trial court found? If not, were the deeds to Mrs. Mitchell procured by undue influences? Is the statute of limitations a bar against plaintiffs' recovery of this real estate on that ground? Is the decree of divorce in Cass county a nullity?

If, as the trial court found, Winch was wholly insane in 1892 when he made these deeds and contracted this second marriage, and remained so until his death, then the setting aside of all his transactions was right and should be affirmed. None of the grantees were ignorant of the actual conditions. If, on the other hand, he was simply weak and under undue influence as a frail old man, past three score and ten, the questions as to the statute of limitations and as to the jurisdiction of the Cass county district court to grant the divorce become important.

The testimony consists of nearly 1,400 pages of stenog-

rapher's notes, taken mostly from the lips of 67 witnesses. It is conceded that there is evidence tending to support the trial court's finding of insanity. Counsel frankly say that if this record is to be examined only to see if it contains evidence which, taken by itself and uncontradicted, would warrant the conclusion reached, then there is no use of going further and the decree should be affirmed. They also confidently assert that an examination of it all will show that the weight of evidence is against the learned court's sweeping finding of insanity; and they claim that the Cass county district court was not without jurisdiction to grant the divorce; and that any claim of mere undue influence in the procurement of these deeds is barred by the statute of limitations.

A somewhat careful examination of the testimony has been made. It shows that Winch was born in 1822, was married in 1847 in Providence, Rhode Island, living there with his wife until 1856, when he went to Chicago; his history from that time is not traced until his arrival in Logan, Iowa, in 1871; after 1856 he seems to have gone home, only occasionally, to Rhode Island, where his family consisted of the wife, three daughters and an epileptic son. In 1871 he located at Logan, Iowa. He was at that time possessed of considerable money; he seems to have engaged in the business of loaning money, in the name chiefly of his wife and of a sister in Chicago, from both of whom he held powers of attorney which were placed on record; his method seems to have been to take secured notes for the full amount of the loan and legal interest, and to exact from the borrower as much additional in the way of bonus as he could obtain, calling it a "chip" or "commission." In the collection of these loans he would frequently acquire the property on which they were secured; he seems to have prospered steadily in the loan business until the year 1885, but to have been from the first inception of it a man of eccentric habits and excitable temper; his actions, as related, amply justify the description of him in these terms by his brother-in-law,

quartermaster general Denis, of Rhode Island.  In 1884 a judgment for $5,000 was recovered against him for assault by a young woman, who claimed he had enticed her to his rooms by a promise of the gift of a sewing machine; she had been employed in a family where he boarded for some years, and was just married.  He seems to have had increasing troubles in his business at Logan, and to have been acquiring, in the meantime, some Omaha real estate; and in 1887, without entirely closing out his property in Harrison county, Iowa, he removed to Omaha, where he had erected an apartment house, in which he had rooms; in 1888 a woman, calling herself Mrs. Mitchell, a dressmaker, took lodging in the house, in rooms adjoining his; another lodger at the time, Mrs. Bowman, testifies that she had been preparing Mr. Winch's meals, but that, almost immediately after the arrival of the new lodger, the latter began to prepare his meals, and very shortly thereafter a door was cut between this new lodger's room and his, and that the rooms were occupied by them in common. The defendant, however, says that she was merely a lodger, and continued her work as a dressmaker, from the time of her entering the building in June, 1888, until November, 1888, when she took employment as Winch's housekeeper at $20 a month, with board, lodging and necessary clothing.  She says that she continued in that capacity and position, without any improper relations, until May 16, 1892, when she and Winch were married in Council Bluffs, Iowa.  The first wife's decree of divorce was rendered at Plattsmouth, on April 30 of the same year.  One witness, however, testifies positively to spending a night in their rooms in 1891, and that Winch and the woman occupied the same bed, in the room next to the one where he slept.

Dr. Tilden, introduced by the plaintiffs to testify as an expert, heard the testimony introduced by the plaintiffs; he also, in the year 1896, and again in 1898, as a member of the Douglas county insanity commission, made a personal examination of Mr. Winch and, on both occasions,

found him insane, suffering from senile dementia, with delusions, especially as to his property. He was asked whether, taking the testimony which had been produced as true, Mr. Winch was insane prior to 1896, when he came under Dr. Tilden's personal observation. The opinion was expressed that he was previously insane. The doctor was then asked, whether, in view of all the evidence, he could fix the time when Mr. Winch became insane. He replied that he could give an opinion on that point, and was asked to do so. To this latter question no objection was made. The doctor then proceeded to recite some of the facts and testimony which led him to conclude that the disease began as far back as 1884, and that its first distinct manifestation was the assault on the young woman in Mr. Winch's rooms, at Logan, in that year, and finally gave it as his conclusion from the evidence that Mr. Winch was not capable of making the deeds, or entering into the marriage contract, in May, 1892, under which Maranda J. Steen claims the real estate involved in this action. Most of this evidence is without objection. Much of it seems obnoxious to the objection that the question was put in such a manner as to cover the very issue to be submitted to the court, a form which is condemned in many well considered cases. *Dolz v. Morris*, 10 Hun (N. Y.), 201; *Smith v. Hickenbottom*, 57 Ia. 733, 11 N. W. 664; *Clark v. Detroit Locomotive Works*, 32 Mich. 348; Rogers, Expert Testimony (2d ed.), sec. 26.

Dr. Akin, called on rebuttal, was asked a number of questions as to the leading writers on the subject of senile dementia, and their statements. He was asked as to who is generally recognized in that community as the best expert on mental diseases, and permitted to answer, over defendants' objection, that it was Dr. Tilden. Doubtless the court "is at liberty to examine other witnesses to aid it to determine whether he (the expert) is qualified to draw a correct conclusion upon the question relating to the science or trade in relation to which he is to be examined." Rogers, Expert Testimony (2d ed.), sec. 17. In

the present instance, however, the examination was not for that purpose, as the evidence by Dr. Tilden had already been submitted. The purpose seems to have been to induce the trial court to give additional weight to Dr. Tilden's conclusion as to Winch's incapacity. The decision seems to have followed Dr. Tilden's opinions, and it is earnestly contended that they are not well founded; that the utmost which the evidence shows as to Winch's condition, up to the time of the making of these deeds to Maranda J. Mitchell and contracting the second marriage with her, is only weakness and eccentricity, and nothing which will justify the finding that those acts are totally void.

It is conceded that in 1896 Winch was violently insane; that he never recovered; and died, demented, in St. Bernard's Hospital in Council Bluffs in 1899; that when he made these deeds and contracted this marriage he was 70 years old and feeble in health; that the trial court was justified in finding that nothing was paid for the deeds, and in finding that the $1,300, which defendant Maranda J. Steen says she let Winch have prior to that time, was wholly mythical, and that she herself had admitted as much in other litigation. Dr. Tilden bases his opinion that the disease had started in 1884 on the statements as to the assault upon Mrs. Rogers, together with some irrational conduct in regard to the removal of a fence, which Winch discovered, in midwinter, was over on his land a few feet. He ordered it immediately removed to his own serious detriment, by exposing his haystacks, as well as to that of the neighbor who was compelled to remove the fence. The testimony of the district attorney of Harrison county, and of the county clerk, to his lack of memory and excitability, and the testimony to the same effect by the witnesses Norman and Bolter, indicated a very great loss of memory, and the progress of the disease through 1888, 1889, 1890 and 1891. In these latter years, there was some evidence produced of his quarreling with the school children; witnesses swearing to his chasing the children with a shotgun, with a club and with a horsewhip. The

doctor cites evidence tending to show that in a number of instances he collected notes, gave receipts against them, then forgot the transaction, and brought suit on the notes. Some testimony by Judge Sullivan of Plattsmouth, who was the first wife's attorney in the divorce suit, was mentioned, that at the time he acted quite irrationally, boasted of his dissolute relations with numerous women, of improper relations with his first wife before he married her, would laugh and cry without cause for either. These things, all combined, in the opinion of Dr. Tilden, indicated that the disease, which had proceeded to complete dementia in 1896, had already become well marked in 1892, when these symptoms were observed. These symptoms are all gathered, as fully as counsel seem to have been able to do so, in question 5440, on page 816 of the testimony, asked on cross-examination of Dr. S. K. Spalding. The latter has 31 years' experience, 20 of it in Omaha; is a graduate of the Bellevue Hospital College of New York city; had made nervous and mental diseases a specialty, and is at present United States pension examiner in Omaha. In the years 1889, 1890 and 1891 he was a member of the school board. He had known Mr. Winch since the fall of 1889, first, as a member of the school board, he rented a room from him for school purposes, from that time until July, 1890, and in April, 1890, a new contract was made, renting the same room and another for the following year for the same purpose; this business the doctor personally transacted with Mr. Winch. While the rooms were occupied as a school room, the doctor was frequently there and had frequent talks with Mr. Winch. The rooms had to be repaired and some alterations made, which Mr. Winch did. His arrangements were well considered and rational. In the spring of 1890 he began to treat Mr. Winch for bronchial trouble, for which the doctor examined him and wrote a prescription; that he treated Mr. Winch for this trouble, occasionally, until some time in the year 1895, when he was consulted with regard to Mr. Winch's kidneys, and found him suffering from excessive uric acid, which

had produced lumbago pains in his back.  Dr. Spalding observed no indications of mental disease or unsoundness while treating him, up to 1895, and thinks he was entirely sane up to that time.  On cross-examination this question was asked of him:

Q.  Supposing a man, 60 years of age, goes to the house of a neighbor in the winter time, on a farm, and has the line fence measured, and finds that the fence is over on his land at one end about a foot, and at the other end about two or three rods; he goes to the neighbor's house in the dead of winter, when the ground is frozen and the snow on the ground, and demands the immediate removal of the fence; holds one hand in his hip pocket and threatens with his fist with the other hand, and does this over the protest of the tenant, that if the fence is removed it will destroy his own crops as well as work an injury to the neighbor, who removes the fence; but in spite of that he proceeds and requires the neighbor to remove the fence; and, about the same time, he finds a young woman on the streets of the town where he lives, who has just recently been married; this young woman had lived in the family where he had lived, for a number of years; she was a virtuous, good woman; he asked her to go over to his office: said to her, "Come over, I want to give you a sewing machine.  She went into the office; he locked the door and she said, "Where is the sewing machine?"  His room—the room where he stayed, his bedroom, instead of his office. He locked the door upon her.  She said, "Where is the sewing machine?  I don't see any in the room."  He answered, "Get down on that bed there, and I will show you the sewing machine."  And they had a fight, and she screamed for help, and finally was able to make her escape. Four years after that event, and in the year 1888, this same man went from his house at 7 or 8 o'clock in the morning, at half past 7 or 8 o'clock in the morning, in a country town, in the summer time, in the month of June, when the people of the town were stirring about, in a public part of the town, in sight of the court house; and he went

with a pair of slippers, pair of drawers, and undershirt and straw hat, and nothing else on his person whatever; led one horse to water to a livery stable in the neighborhood; down one alley and out another alley; took that back, and led another horse and watered it, in this condition; later, in the same summer, and not long after that, he goes to this barn, the same barn, and demands the team of another man and wants to drive that team; the liveryman says, "You can't have that team"; and, in spite of that, he goes and gets a harness and says, "Now I want to drive that team." And the man still says, "You can't drive that team," and tells him to go away and leave the barn. A few years later than that, 4 years or 3 years later than that, he commenced a divorce suit against the wife by whom he had 6 children, in a county other than the county of his residence; and, in the preliminary motions to the divorce trial, he engages in conversation with the other lawyers, on the other side of the case, and says to them, and refers to his wife as a damned old bitch, and laughs, and, in the next sentence, he refers to his children and cries; and later on in the trial of the case, he testifies upon some matters in the case in an apparently rational manner; he a little later than this becomes embroiled—before this, in the years 1890, 1891 and 1892, he becomes embroiled in quarrels with school children of the neighborhood; he runs certain of the children with a shotgun; he runs others with a buggy whip; others with a club; he drives through the streets of the city where he lives with a sulky and a peaked jockey cap, behind a horse which he supposes is fast, although as a matter of fact it is not a fast horse; in the years 1891 and 1892, at different times, he called at the office of the clerk in the village first mentioned; he speaks to the clerk of the court, and demands the inspection of certain records and, when they ask what records he wants, he says he has forgotten what records he wants, and leaves the office; at other times he goes to the clerk's office, and asks for information about certain cases, or certain records, which the deputy clerk gives

him and explains to him fully, and within five minutes he comes back, and asks for the same information, saying he has forgotten; at these visits he talks to the clerk, and to his deputy there, secretly and confidentially about matters which are not of a secret character, but of public nature and public records; and takes them into the vault of the clerk's office in order to talk to them, at times, not always, and all of these things occur prior to the making of a deed, which he made on the 10th day of May, 1892; prior to this time, he also had a housekeeper come to his house in the year 1888; she stayed with him until the year 1892, at which time, after the making of certain deeds, he entered into the marriage relation, or attempted to enter into the marriage relation with her; prior to the time he was married to her, he lived with her in the same rooms; at times they occupied the same bed; their clothes were in the same wardrobe, and she exercised great influence over him; she attended the divorce trial against his first wife at the neighboring city, sat at the counsel table—attended him when he went to the lawyer's office concerning his divorce; took an active interest in the divorce case and in all proceedings relative to it. Putting these things together, and that he, in this deed of May 10, deeded all his property in the county where he. lived; in subsequent deeds, he deeded all the property he had to this woman, including not only the lands, but notes and mortgages and all securities of every character, amounting to approximately $40,000 worth of property and lands, and this without any consideration, unless it was a few hundred dollars, or less than $2,000 at most; taking these circumstances into consideration, are you able to say whether the man that I have described was sane or insane at the date, 1892, when he made that deed?

A. Whether he was sane or insane?

Q. Yes, sir. I will add to that question, also, that he used a catheter from the year 1888 on, until the time he died. I will add these other elements, if you will permit me, that in 1896 he was declared insane by the insanity

commission of the county where he lived, and that he died in the asylum in 1899?

A. A part of his acts show the results of a self-willed sane man, and the other part show the results of an insane man. Of course the insanity part of it, when he was declared insane by the board, he was evidently insane, but the other parts—

Q. I am asking you now for your opinion as to his sanity or insanity in the year 1892?

A. I would say he was sane.

Some complaint is made of the unfairness of Dr. Spalding, and of the fact that senile dementia is even declared by him not insanity at all. There seems, however, nothing to indicate that he was unfair in describing his intercourse with Mr. Winch during the years from 1889 to 1895, and a number of witnesses, including Dr. Gibbs, and Dr. Bailey, a dentist, B. B. Wood of the Merchants National Bank and C. S. Rogers formerly of the same institution, where Mr. Winch had a bank account from 1887 to some time in 1896, George F. West, agent of the North Western R. R. Co., and Mr. Jamison of Hayden Bros., where Winch had an account, and other witnesses including Mr. Gates, testify that there was nothing in Mr. Winch's actions or manner during the years from 1890 to 1895 that impressed them as indicating mental unsoundness. It is true that some of them, like the chief defendant herself, weakened their statements by making their testimony apply to the years 1896 and 1899, when he was admittedly hopelessly insane, as the sister of Mrs. Steen writes to the witness Norman in September, 1896, a "raven maniac."

The evidence, however, taken as a whole, indicates that in May, 1892, Winch had become a weak and feeble old man entirely under the influence of Mrs. Mitchell, as she then called herself. His institution of the action for divorce in Cass county, and his subsequent attempt to dismiss it when the first wife appeared to contest, and the prominence of Mrs. Mitchell in that litigation, and the deed-

ing to her of the property 10 days after the decree was rendered, while Winch was alarmed at the prospect of the lawyers getting it, indicate great weakness on his part, and it is not improbable that there was already, as Dr. Tilden indicates, some mental unsoundness, enough, it would seem, to render the deeds voidable in connection with the lack of consideration, and the undue influence exercised by Mrs. Mitchell. It does not seem, however, that the evidence in this case warrants a finding that there was, at that time, any such total want of understanding or special delusion causing these deeds, as would render them void, in the absence of any fraud or undue influence. *Mulloy v. Ingalls,* 4 Neb. 115; *Dewey v. Allgire,* 37 Neb. 6. There can be very little doubt that a conveyance by Winch at the time in question, fairly made to one who paid a good consideration, would have to be upheld. There are no facts in this record on which such a deed could be set aside. The action of the trial court can therefore only be upheld on the ground that, in addition to the weakness of mind, there was fraud or undue influence in the causing of the transfers, and that the second marriage was void for some other reason than Winch's insanity. If he was capable of contracting, his second marriage was valid, unless the previous one stood in the way. Compiled Statutes, secs. 1, 2, chap. 52 (Annotated Statutes, 5300, 5301).

It is urged, however, that unless absolute insanity is found to exist in this case, the action was barred by section 12 of the code. It is true that this section has been held to bar, after 4 years, an action by the heirs of a former owner to set aside a deed for fraud and undue influence. *Kohout v. Thomas,* 4 Neb. (Unof.) 80. And an owner claiming fraud in the sale of the premises by an assignee in bankruptcy has been held subject to the same bar. *Hughes v. Housel,* 33 Neb. 703.

In *Parker v. Kuhn,* 21 Neb. 413, 433, it is held that a bill to redeem by a junior incumbrancer from a sale had by a prior lienholder is governed by section 16 of the code and must be brought within 4 years. In addition to the

above holdings, there are a great many more to the effect that a creditor's bill, claiming no interest in the title except through the fraud in the conveyance, must be filed within four years, under section 12.

These latter, manifestly, have nothing to do with section 6, which provides for the commencing of an action to recover "title and possession" of land within 10 years after it accrues. It is hard to see why this section 6 does not apply as well to a suit in equity brought by an heir to get title, who claims the deed of an ancestor is void, as it does to an action in ejectment based on the same claim. The holdings of this court, above given, seem to have settled, however, that the equitable action must be brought within 4 years.

Even this does not relieve the defendants in this case. The petition expressly alleges, and the facts show, that the control over Winch by his second wife continued steadily until his violent delusions necessitated physical restraint. This was procured by her and lasted to the end of his life. The procuring and holding of these deeds and of this property by such means was therefore a continuing act, which closed only with his death in 1899. This action was begun in April, 1902, by his heirs. No authorities have been cited to sustain a holding that a weakness and undue influence which could wrongfully cause the deeds in May, 1892, and which only increased as the years went on, would not excuse the bringing of an action by Winch while it lasted. It is not thought that any can be found. The fraud must be deemed to have continued till 1899, and the action therefore to be in time.

It remains to consider what is the effect of the Plattsmouth divorce and of the second marriage. The provision of section 1, chapter 25, Compiled Statutes (Annotated Statutes, 5324), that the marriages declared void by section 3, chapter 52 (Annotated Statutes, 5302), shall be so without any decree of divorce, would impliedly prevent all others from being so. Section 3 avoids marriages only between a white person and a negro of at least one-fourth

blood; marriages where either party has a husband or a
wife, or is insane or an idiot, or the parties are too nearly
related.   Section 1, chapter 52, Compiled Statutes (An-
notated Statutes, 5300), makes consent the essential requi-
site to civil contracts, which it makes marriages to be.
Thus this state seems clearly to have adopted the prevailing
rule that, while absolute inability to contract, insanity or
idiocy, will avoid a marriage, mere weakness will not, un-
less it extend so far as to produce the derangement that
avoids all contracts, by doing away with the power to con-
sent. 1 Bishop, Marriage and Divorce (4th ed.), sec. 125.
As we have concluded that this power was not destroyed in
Mr. Winch until some time in 1895 or 1896, it follows that
the marriage of May 16 was valid if the former one was
no obstacle.   That former marriage had been attempted
to be dissolved by the Plattsmouth divorce.   It is urged
that section 45, chapter 25, Compiled Statutes (Annotated
Statutes, 5369), forbids the marriage of a divorced person
within 6 months after the rendition of the decree.   The
prohibition, however, extends only for 6 months after the
decree.   In the present case, if the divorce was valid, the
continued cohabitation of the parties, under claim of mar-
riage, after that time would make them man and wife.
Winch's capacity lasted at least this long.   *Eaton v. Eaton*,
66 Neb. 676.

The only remaining question is, whether or not the
action of the district court for Cass county was so entirely
without jurisdiction as to render the decree void.   If the
divorce decree was void, there was no marriage with Mrs.
Mitchell.   By the time the first wife died, June, 1898,
Winch had become, and after that remained, hopelessly
demented and incapable of assenting to a marriage.   This
question seems to have been carefully considered by the
court at Plattsmouth after Mr. Winch, discouraged by
the cross-bill, sought to dismiss his action, and have the
cross-bill dismissed on the ground that the Cass county
district court had no jurisdiction.   This was refused, and
no appeal taken.   Section 6, chapter 25, Compiled Stat-

utes (Annotated Statutes, 5328), provides that a divorce may be granted in the county where the parties, or either of them, reside, on a petition by the aggrieved party. In this case the husband had applied in Cass county, though residing in Douglas, and had procured service on the wife by publication. The wife then exhibited a cross-petition. He then asked to dismiss. The district court held, that he was estopped from denying his residence in Cass county, and must abide by the forum of his own selection.

Of course, the sole ground on which the motion to dismiss the cross-bill could be sustained would have been that section 6, above quoted, in giving jurisdiction "where the parties, or one of them, reside," impliedly forbade it to all other district courts of the state. No action of parties or of the court itself can enlarge the latter's powers over the subject matter. The law, alone, creates a tribunal.

In *Burkland v. Johnson,* 50 Neb. 858, the want of an acknowledgment of an arbitration agreement was held to prevent jurisdiction to render judgment on it, though all the parties were before the court. In *Anderson v. Story,* 53 Neb. 259, the county court was held to have no jurisdiction to examine the accounts of a foreign guardian, and the case was dismissed here for that reason, after having been litigated by the parties without objection in the county and district courts. In *Johnson v. Bouton,* 56 Neb. 626, it is decided that a district judge, at chambers, has no authority to dismiss an action for an injunction, and such act is void, though the parties agree that he may decide it there. In *Armstrong v. Mayer,* 60 Neb. 423, the right of the district court to entertain an appeal in forcible entry and detainer cases was denied, though both parties acquiesced and tried the case there.

In the present case, however, it is clear that an act of a party could confer jurisdiction. The first Mrs. Winch could have taken up her abode in Cass county at any time before the trial, and given the court full power under section 6 to hear the case. It seems probable that the action of plaintiff in filing there his petition and affidavit for

publication, had estopped him to object that she had not done so. That, in itself, was an implied statement that he resided in Cass county, on which she had a right to rely. Of course, if he was estopped, she, and any one claiming through her, must be, after she has acted on that estoppel. Section 11, chapter 25, Compiled Statutes (Annotated Statutes, 5334), provides that divorce cases shall be conducted as other suits in equity. Section 8 makes residence in the state essential. It seems clear that the effect of section 6, above cited, is not to limit the jurisdiction, but to provide for its exercise with due regard to parties' convenience. Of course, there was no authority of law for any publication of notice in Cass county. In the absence of any appearance by defendant, the whole proceedings would have been of no effect as against her. But she did appear and got the decree, and it does not seem that his heirs can collaterally assail it. The decisions seem to hold that appearance by a defendant in divorce cases confers jurisdiction of the person.

In *In re Ellis' Estate,* 55 Minn. 401, 23 L. R. A. 287, the claim of some heirs that their father's marriage was void because his first wife had been divorced in a county in Wisconsin, where neither party resided, was disallowed. As here, the parties had appeared, and alimony been awarded and paid. The court say that bringing the action in a wrong county is but an irregularity.

Estoppel on a party plaintiff to claim nonresidence, as affecting jurisdiction in a divorce proceeding, is distinctly held in *Ellis v. White,* 61 Ia. 644, 17 N. W. 28. In *Chichester v. Donegal,* 1 Add. Eccl. Rep. (Eng.) 13, entering appearance in London is held an estoppel to claim want of jurisdiction because of actual residence in Dublin. Other cases are cited in a note to *In re Ellis' Estate, supra.* Of course, as held in *People v. Dawell,* 25 Mich. 247, if neither party is actually domiciled in a state, no jurisdiction to act upon their status in that state's courts can attach. In the present case, there is no question as to jurisdiction in the state. That being so, it would seem that under the pro-

vision, that the rules of equity procedure shall apply to divorce proceedings, the ordinary rules of estoppel must apply.

Is it, however, necessary that it be held that the action of the Cass county district court was right, in order to make it conclusive? The question as to jurisdiction here is not as to the powers of the court, but whether those powers were brought into action by the facts of residence and the situation of the parties, brought about by their own acts. The question as to the court's jurisdiction under those facts was raised and decided. That decision remains entirely unmodified. Was not the court authorized and required to pass upon the existence of these facts and their effect, and is not its adjudication conclusive until reversed or modified? *Phelps v. Mutual Reserve Fund Life Ass'n,* 112 Fed. 453, 50 C. C. A. 339; *Dowdy v. Wamble,* 110 Mo. 280; *City of Delphi v. Startzman,* 104 Ind. 343; *State v. Scott,* 1 Bailey (S. Car.), 294; *Strohmier v. Stumph,* Wils. (Ind.) 304.

We are satisfied that the decree of divorce is valid as against this collateral attack.

It is recommended that the decree of the district court setting aside the several deeds of conveyance be affirmed, and that so much of said decree as disaffirms the marriage of Seth F. Winch and Maranda J. Winch be reversed and set aside, and that the title to the several tracts of land therein set aside be decreed to be in said plaintiffs, subject to the dower right in said Maranda J. Winch and her grantees, if she has conveyed it.

Ames and Oldham, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the decree of the district court is so far modified as to judge and affirm the validity of the marriage of Seth F. Winch and Maranda J. Winch, now Maranda J. Steen, as alleged in the answer and cross-petition of the said Maranda J. Steen, and that the title of the plaintiffs in

the lands described in the petition, by them inherited from their father, the said Seth F. Winch, is subject to the right of dower of the said Maranda J. Winch and her grantees, and, as so modified, the decree of the district court is affirmed.

JUDGMENT ACCORDINGLY.

The following opinion on rehearing was filed June 30, 1904. *Decree of district court affirmed:*

1. **Divorce:** JURISDICTION.  The district courts of this state have **no** jurisdiction of the subject of divorce except such as is given them by the statute providing for divorce and alimony.

2. ——: ——: RESIDENCE.  The residence of one of the parties in the county in which the action is brought is necessary to the jurisdiction of the court.

3. **Judgment:** JURISDICTION: COLLATERAL ATTTACK.  When the record affirmatively shows the nonexistence of some fact necessary to the jurisdiction of the court over the subject matter of the action, a judgment pronounced therein will be void and may be collaterally attacked.

SEDGWICK, J.

Argument was had before the court upon the motion for rehearing in this case.  The principal question discussed was the jurisdiction of the district court for Cass county in the divorce proceedings discussed in the former opinion. It appears that in those proceedings the court found that neither party was a resident of the county.  In fact, after Mr. Winch had begun that action for a divorce, and his wife had filed her cross-petition asking for a divorce and alimony against him, he sought to dismiss the proceedings, and for that purpose challenged the jurisdiction of the court upon the grounds specifically alleged by him, that neither party was a resident of Cass county.  This was not controverted by the cross-petitioner, but it was urged that Mr. Winch, by bringing the action in that county, was estopped to deny the jurisdiction of that court.  This theory appears to have been adopted by the court and,

accordingly, the action was proceeded with upon the cross-petition, and a divorce decreed in her favor.

1. In *Cizek v. Cizek,* 69 Neb. 800, the second proposition of the syllabus is:

"Jurisdiction of the court in matters relating to divorce and alimony is given by the statute, and every power exercised by the court with reference thereto must look for its source in the statute, or it does not exist."

The jurisdiction of the district court to decree a divorce is given by section 6, chapter 25, Compiled Statutes (Annotated Statutes, 5328):

"A divorce from the bonds of matrimony may be decreed by the district court of the county where the parties, or one of them, reside, on the application by the petition of the aggrieved party in either of the following cases."

There follows a statement of the grounds for divorce.

Section 8 places further restrictions upon the party applying for divorce:

"No divorce shall be granted unless the complainant shall have resided in this state for six months immediately preceding the time of filing the complaint, or unless the marriage was solemnized in this state, and the applicant shall have resided therein from the time of the marriage to the time of filing the complaint."

This language clearly is not intended to enlarge the jurisdiction of the court. We think the reasonable construction of these sections is that the district court has no jurisdiction in divorce cases unless one of the parties is a resident of the county. The place of residence of the parties, being a question of fact, must be investigated as other questions of fact are investigated. If the pleadings had presented that issue, and the record showed that evidence had been taken thereon by the court, the question whether a judgment rendered therein would be conclusive upon the parties as against a collateral attack, would be a very different question from the one presented here.

This record shows conclusively that neither party re-

sided in Cass county when the cause was begun, nor when it was tried.

In questions of jurisdiction over the person, the rule is that, when the record shows that no such jurisdiction exists, the judgment rendered against such party is void, and its validity may be shown in any action in which it may be called in question. *Chicago, B. & Q. R. Co. v. Hitchcock County*, 60 Neb. 722; *Fogg v. Ellis*, 61 Neb. 829. The same rule, of course, is applicable to questions of jurisdiction over the subject matter. We conclude that the divorce proceedings in Cass county were void, and that no rights can be predicated thereon.

2. Upon the question of the insanity of Mr. Winch at the time of the execution of the instruments attacked in these proceedings, and also upon the question whether those instruments were procured from him by undue influence, we are satisfied with the reasoning of the commissioner upon the former hearing, and also with the commissioner's discussion of the application of the statute of limitations to these proceedings. The claims of the defendants William H. Gates and Henry Rice are, in their brief, predicated entirely upon the validity of these conveyances, which were by the commissioner held invalid. This appears to dispose of all of the questions raised in the case.

The judgment of this court upon the former hearing modified the decree of the district court. That part of our former judgment is therefore vacated and the decree of the district court

AFFIRMED.