JENNIE BELLE ADAMS, APPELLEE, V. WALTER SCOTT, APPELLANT.

FILED APRIL 17, 1913.   NO. 17,150.

1. Marriage: ANNULMENT: INSANITY. This state has adopted the prevailing rule that while absolute inability to contract, insanity or idiocy, will avoid a marriage, mere weakness of mind will not, unless it extends so far as to produce the derangement that avoids all contracts by doing away with the power to consent. *Aldrich v. Steen,* 71 Neb. 33.

2. ——: ——: ——. The courts of this state are not authorized

to decree a marriage contract void on the ground of insanity or idiocy of one of the parties, except for such want of understanding in such party as to render him or her incapable of assenting thereto.

APPEAL from the district court for Lancaster county: LINCOLN FROST, JUDGE. *Reversed and dismissed.*

John E. Lowe and George W. Miller, for appellant.

G. E. Hager, F. C. Foster and F. A. Boehmer, contra.

BARNES, J.

Action to annul a marriage for the alleged incapacity of one of the parties to the contract. The action was brought in the district court for Lancaster county by one Dora Doyle, as the next friend of Jennie Belle Adams, against Walter Scott, to whom Jennie was married on the 2d day of October, 1910, alleging that she was insane or an idiot at the time of her marriage.

It appears, without dispute, that Jennie was left by her mother at an institution called the "Tabitha Home," located in the suburbs of the city of Lincoln, when she was ten years of age; that at the time of her marriage she had been in that institution for 16 years; that during all of that time she had been required to perform menial labor in the nature of washing, scrubbing and other domestic service, without remuneration; that she had been compelled to wear cast-off clothing and coarse shoes, much too large for her; that she had been given very little schooling; that for a short time there was a German teacher at the Home, from whom Mrs. Scott learned to speak German and count in that language. This was the extent of her education. During the 16 years she was at the Home she had been but three times to the city of Lincoln, and once to the state fair. She was industrious and faithful and performed her tasks well. For some 10 years prior to the marriage Walter Scott, the defendant, had been the bookkeeper at the Home, and had thus become acquainted with her. He had noticed her condition,

Adams v. Scott.

and had purchased her some articles of clothing, among
which was a pair of shoes which were small enough to fit
her, and with which she was greatly pleased. A short
time before her marriage defendant left the Home and
obtained remunerative employment in the city. He had
promised Jennie that he would procure a suitable home
for her, and would take her away from the institution.
According to his promise, on the 2d day of October, 1910,
he appeared at the Home and informed Jennie that he
was ready to take her away. He gave her suitable wear-
ing apparel, and told her to dress herself up nicely and
they would go and be married. She dressed herself suit-
ably, came out, got into the buggy, and went with him to
the city, where they procured a license, and went before
Justice Stevens and were married. When they failed
promptly to return to the Home, and the authorities there
had ascertained the fact of the marriage, they came to
Lincoln, and caused Scott and his wife to be arrested and
confined in the city jail. Mrs. Doyle took her back to the
Home, and the defendant Scott was discharged. After a
time Scott sued out a writ of habeas corpus to obtain the
release of his wife from the custody of those in charge of
the Home, and thereupon Mrs. Doyle commenced this
suit, as the next friend of Mrs. Scott, to annul the mar-
riage. A trial resulted in a decree for plaintiff, from
which this appeal is taken.

Appellant contends, among other assignments of error,
that the decree is not sustained by the evidence, and is
contrary to law. As we view the record, the case may be
disposed of by a determination of this question.

The petition alleges, and the answer admits, the secur-
ing of a license and the marriage in question, in due con-
formity to law. In such a case every presumption of law
is in favor of the validity of the marriage until it is re-
butted, and the burden of proof was on the plaintiff to
rebut this presumption. *Ward v. Dulaney,* 23 Miss. 410;
*Nonnemacher v. Nonnemacher,* 159 Pa. St. 634; *Anony-
mous,* 4 Pick. (Mass.) 32.

To maintain this issue, plaintiff produced the evidence of Mrs. Doyle, who testified, in substance, that she had been acquainted with Jennie Belle Adams since about two hours after her marriage; that she talked with her at the time, and asked her if she knew what it meant to be married, and put it in very plain words. She told her what her husband would expect of her, and Jennie said: "I will never do it." Jennie said her husband had rented a room for her, and that she was going to live in that room and do light housekeeping. The witness did not ask her whether she could do anything in the way of work, or keep house. She told Jennie to dress herself so she could take her out to the Home, and Jennie said: "You will have to put in my combs." The rest of her clothes were on, she having slept that way all night; that she did not know Jennie until the morning after she had been put in jail; that Jennie's mind was that of an overgrown child. She stated that her conclusions were based on general observations; that she did not examine Jennie as a doctor would.

One Doctor Miller testified that he had been called to the Tabitha Home as a physician, and has acted four years at that Home; that he occasionally visited and examined the inmates there; that he had examined Jennie about two and a half or three years ago; that she could not do the ordinary work of a person of her age and size; that she did not know the difference between right and wrong; that she could not take care of herself; that he had discovered defects by her conversation and general appearance, which was a result of lack of mental growth; that she could not learn to take care of herself; that she had the mental capacity of a child 15 or 16 years of age in some ways; that she had not much unity of thought or continual line of reasoning; that in his opinion she was born with a normal brain that would develop or could be developed normally; that she would smile when he spoke to her. He also testified that he did not know that Jennie had learned to speak German; that the food she got at

the institution would make a difference in her mental development; that he had seen Jennie use what they called a "mop"; that he had nothing to do with the people working there at that class of work; that Jennie would not work, even if she was paid for it, and would not understand what you meant if you offered to give her a present.

Anna Osthoff testified that she lived at the county jail; that she had charge of the woman; that Jennie told her she had been put in the Home when she was 10 years of age; that her mother never came to see her, and she cried about that; that Jennie stated that she was married, and wanted to live with Mr. Scott; that she was his wife, and that she was married to him. On redirect examination she stated that, when the girl was first brought to the jail, she thought she was a crazy woman; that, after she found out the circumstances, she thought she could not expect anything else; but, after she was with her several days, she saw she was not crazy; that Jennie showed a lack of education, but knew how to work, and did it right; that she did what she was asked to do, and did it well.

Want of space forbids any further statement of the evidence produced by plaintiff. We deem it sufficient to say that like testimony was given by some other witnesses. It must be observed, however, that no witness for the plaintiff testified that Jennie was either insane or an idiot.

A. A. H. Mayer, for the defendant, testified, in substance, that he had lived in Lincoln for 7 years; that he was manager of the Tabitha Home from 1903 to 1905; that he became acquainted with Mr. Scott and Jennie Belle Adams at the Home; that Jennie did not have much education, but was a good and willing worker; that she scrubbed, helped in the laundry, washed dishes in the kitchen, and turned the washing machine, putting in from 10 to 12 hours a day at that work; that they had a German school teacher out there, and Jennie had learned to read and write German; when he came there Jennie was 19 years old; she wore shoes actually big enough for himself, and her clothes were the same way; that she was required

to wear just what was donated to the Home. He had noticed that she always kept herself clean. He said Jennie had been in his charge for 12 days at his home, and he had taken particular notice of her after Judge Cornish had placed her in his charge; that he had taken particular notice of her for the reason that his wife had been "in the same shoes as what Jennie Belle Adams is today." He stated that Jennie had taken his baby out in her arms, and had been around his babies; that she offered to work at his home without being asked; that she had done her work faithfully and honestly; that she did not act insane or feeble-minded at his home; that he had talked to Jennie about her marriage on the second night she was there. She said she had married Mr. Scott to get a happy home; that she had been a slave at the Home, and had not received any money since he left; that, although Mr. Scott was a little older than she was, he had promised to give her a home; that she would be true and faithful to him if they lived together.

Justice Stevens testified that he had met Mrs. Scott, and performed the marriage ceremony; that he had had experience in performing marriage ceremonies, and looking into the faces of people and judging as to their competency; that he did not notice anything peculiar about Jennie, and was surprised when there was any objection to the ceremony; that she seemed reticent, but took part in the conversation to some extent; that he thought she appreciated what was going on; that she seemed pleased, and seemed to be able to appreciate the remark made by him as to the simplicity of their wedding arrangement; that she had no prompting as to how she should answer at the marriage ceremony, and answered the questions as propounded to her intelligently; and there was nothing whatever that would cause him to suspect that there was anything wrong.

Reverend Henry Heiner testified that he had lived in Lincoln about 28 years; that he had been connected with the Tabitha Home from 1887 to 1895; that he was ac-

quainted with Jennie Belle Adams; that she understood a simple contract; that when something was promised her in the way of clothing she did her work most cheerfully; that she always remembered and expected the things promised; that she had an opportunity to learn German and English, and that she had learned both; that she had some musical ability, and could sing songs.

Doctor John T. Hay, whose competency as a specialist in mental and nervous diseases is beyond question, testified that he had made an investigation in this case as to the idiocy of Jennie Belle Adams. The physical signs of idiocy may be an abnormally large head or abnormally small head, and a lack of symmetry in the features; peculiar form of the bones, especially the palate and the teeth; and lack of expression in the face; that he had applied those tests to Jennie Belle Adams to a certain extent, and physically found no marked defect, except that she was a little short of stature compared to her breadth; she was somewhat awkward in her movements, but her features were fairly formed and symmetrical; and he could discover no abnormality in the shape and size of her head; that he questioned her, and she answered his questions readily and correctly; that she impressed him as being a very ignorant person. She gave her name, and told him she was born in Omaha, but could not tell where in Omaha. She gave her age as 26; said that she had been to German school for a certain length of time, and had learned to speak some German. She could count both in German and English; she could write her name, make letters and make figures; she knows the name of the city; she knows where she lives; she knows the street on which the Home is situated; and was rational as far as he knew; that she was a rational person, and was not insane or an idiot; that she was in a normal condition, was not deranged, and he could not say in law that she was feeble-minded, but that from a medical sense he saw that she was not, and that she was not insane; she was not deranged, she could classify forms, and understand what

was going on around her in matters pertaining to her own welfare; that she knows she is married, and is willing to live with her husband, and is very decided about not going back to the Home; that she seems to appreciate her condition and situation at this time; and that she is not deranged on any subject, according to his understanding of the word.

Jennie was called as a witness, and testified, in substance, that she had never been in court before; that she was married to Mr. Scott; that she wanted to marry him; that she did not know what the action was brought against her for; did not know anything about court proceedings; that she had been up town once since she had been at the Home; that she did not want to go back; that she liked Mr. Scott; that she loved him; that she expected to cook for him, expected to keep house for him and sweep and scrub for him. She stated that when she married Mr. Scott she had promised to be faithful to him; that she would do whatever he wanted her to do; and that she would keep house for him; that she understood what she was to do as a wife; and that Mr. Scott as a husband was supposed to work and bring in the money to keep her on; that she understood that she was being married; that they stood up while being married. She stated that the judge asked her if she would love, honor and obey her husband, and she said she would; that Mr. Scott had said he would protect, cherish and be faithful to her, and that she understood.

The testimony of defendant Scott corroborated the evidence of his other witnesses.

To avoid extending this opinion to an unreasonable length, we have been compelled to omit some of the testimony. We are satisfied, however, that the evidence fails to sustain the plaintiff's allegation that at the time of her marriage Jennie Belle Adams was either insane or an idiot. At most, the record only shows that her mind was to some extent weak and undeveloped. But it seems clear that she understood the nature of the marriage contract,

and much of what was expected of her as a wife. In such a case the courts are not authorized to annul the marriage.

This state seems clearly to have adopted the prevailing rule that, while absolute inability to contract, insanity or idiocy, will avoid a marriage, mere weakness will not, unless it extends so far as to produce the derangement that avoids all contracts by doing away with the power to consent. *Aldrich v. Steen,* 71 Neb. 33; 1 Bishop, Marriage and Divorce (6th ed.) sec. 127; *Ward v. Dulaney,* 23 Miss. 410; *Foster, Adm'x, v. Means,* 42 Am. Dec. (S. Car.) 332; *Anonymous,* 4 Pick. (Mass.) 32; *Nonnemacher v. Nonnemacher,* 159 Pa. St. 634; *Lewis v. Lewis,* 44 Minn. 124, 9 L. R. A. 505. Mere weakness of mind is not a sufficient ground for the annulment of a marriage, unless it amounts to idiocy or insanity. *Svanda v. Svanda, ante,* p. 404. The statutes of this state contain no rule defining the amount of mental weakness required to annul a marriage contract, and we are therefore constrained to follow the rule of the common law as announced by the foregoing authorities.

It may be said that the marriage of Jennie Belle Adams, when considered as a question of eugenics, should have been prevented. However desirable it may be to prevent such marriages, as the law now stands they are valid, and the courts have no power to annul them.

The judgment of the district court is therefore reversed, and the action is dismissed.

REVERSED AND DISMISSED.

REESE, C. J., LETTON and SEDGWICK, JJ., concur.

ROSE, FAWCETT and HAMER, JJ., not sitting.