RENNE EDMUNDS, GUARDIAN OF THE ESTATE OF
HAROLD EDWARDS, INCOMPETENT, APPELLANT, V.
INEZ EDWARDS, APPELLEE.

287 N. W. 2d 420

Filed January 8, 1980.   No. 42535.

Renne Edmunds of Knowles & Edmunds, for appellant.

Vard R. Johnson and William L. Monahan, for appellee.

Heard before KRIVOSHA, C. J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

BRODKEY, J.

This case involves an action brought in the District Court for Douglas County on May 23, 1977, by Renne Edmunds, guardian of the estate of Harold Edwards (hereinafter referred to as Harold), against Inez Edwards (nee Ryan, hereinafter referred to as Inez), to annul the marriage of his ward Harold to Inez, which occurred on May 10, 1975. In his petition, the guardian alleged that the marriage was void for the reason that Harold did not have the mental capacity to enter into a marriage contract on that date, which allegation was specifically denied by Inez. In its order entered on November 27, 1978, following trial of the matter, the District Court found that Harold was mentally retarded, as that phrase is commonly used in medical science, but not to a degree which, under the law of the State of

Nebraska, is of such a nature as to render him mentally incompetent to enter into the marriage relation, and that at the time of the marriage between Harold and Inez, Harold had sufficient capacity to understand the nature of the marriage contract and the duties and responsibilities incident to it, so as to be able to enter into a valid and binding marriage contract. The court therefore found that the marriage of Harold and Inez, which occurred on May 10, 1975, was, in fact and in law, a valid marriage and continues to exist as a valid marriage under the laws of the State of Nebraska, and is in full force and effect. The guardian has appealed to this court from that order. We affirm.

Harold was born on August 7, 1918, and was institutionalized at the Beatrice State Home as mentally retarded on September 25, 1939. He was a resident at the Beatrice State Home for a period of approximately 30 years. It was during this period that he first met Inez, who was also a patient of the home, and Bill Lancaster, who lived with Harold in Omaha after their release from the Beatrice State Home, and who has continued to reside with Harold and Inez since their marriage. Harold was placed in Omaha on November 14, 1969, and started a new life under the auspices of the Eastern Nebraska Community Office of Retardation (ENCOR), which was established in 1968 to provide alternatives for institutionalization of retarded persons at the Beatrice State Home and to assist in the normalization of the retarded in local communities. After coming to Omaha, Harold obtained employment as a food service worker in the Douglas County Hospital on February 16, 1970, and lived in a staffed ENCOR apartment from that time until shortly before his marriage in 1975. As will later be made apparent, he has functioned satisfactorily in that employment, and has received promotions and salary increases since commencing on that job. While under the

auspices of ENCOR, Harold and Inez developed a romantic interest in each other and eventually decided to get married. The date of the marriage was postponed in order to afford the couple the opportunity to have premarital sex counseling and marriage counseling from the pastor of their church in Omaha. They were married by Reverend Verle Holsteen, pastor of the First Baptist Church in Omaha, Nebraska, and their friends, staff members of ENCOR, and out-of-state relatives attended the wedding in that church. The guardian did not bring this action to annul the marriage for a period of approximately 2 years after the date of the marriage ceremony.

Before discussing the nature of the marriage contract in Nebraska, and the legal aspects of annuling marriages on the ground of lack of mental capacity, it will be helpful to first review some of the pertinent testimony presented by the witnesses who testified at the trial. There is no question but that Harold was mentally retarded at the date of his marriage. The question in this case is the degree of his mental retardation, and whether it was such as to prevent him from entering into a valid marriage contract.

According to testimony in the record, mental retardation refers basically to delayed intellectual function and developmental delays usually associated from the time early in life and persisting throughout life. There are various degrees of mental retardation according to the official diagnostic system or nomenclature of the American Medical Association. Those degrees are mild, moderate, severe, and profound. Formerly, there was older nomenclature that defined the degrees of mental retardation as idiot, imbecile, and moron. The older classification of idiot is now encompassed under the two new groupings of "profound" and "severe;" the older classification of "imbecile" is now encompassed within the range of moderate mental retardation; and the older term "moron" is today classified as

mild mental retardation. The expert medical witnesses for both parties agree that Harold falls within the classification of mild mental retardation.

The guardian first called his medical expert, Dr. Robert Mitchell, a psychologist connected with Creighton University in Omaha. Dr. Mitchell expressed the opinion that he did not believe Harold was competent to enter into a valid marriage, but admitted on cross-examination that being mildly mentally retarded did not automatically preclude a person from marriage. He also testified that he had asked Harold during his examinations and consultations what marriage meant, to which Harold responded "For life," and also "You stay married forever." Harold told Dr. Mitchell during the interview that he wanted to get married. Dr. Mitchell also stated: "[I] found no evidence from him or the way he behaved in my interview that he was attempting to get out of the marriage, he seemed very happy with the marriage * * *." Dr. Mitchell also testified: "It is much better, I think, to refer to Mr. Edwards as a person who is fifty-nine years of age who is not as bright as most people. But he has had fifty-nine years of experience, and he is an adult, and physiologically he is matured, as well."

The medical expert witness called by the defendant was Dr. Frank J. Menolascino, a psychiatrist specializing in the field of mental retardation, and author of numerous books and articles upon the subject. He was well acquainted with Harold, having first met him in 1959 when he was doing work at the Beatrice State Home, and had seen Harold many times since that time. He had examined Harold in December 1977, and again in July 1978, during the week Dr. Menolascino testified. He testified that Harold was not functioning below the mildly retarded range and that the tests reflected that a great deal of Harold's difficulty appeared to be primarily a lack of training. Harold told him he was marrying

a lady he had known at the Beatrice State Home and that he had had premarital counseling from the minister of his church and also sexual counseling. Dr. Menolascino also testified that he had asked Harold why he wanted to get married, and Harold replied, "I don't want to be lonely." Harold had been married approximately 2½ years before Dr. Menolascino saw him in December of 1977, and his mental status was "remarkably similar to the one I had seen in the past in the '60s." Dr. Menolascino was asked: "Doctor, do you believe that you have an opinion as to whether Mr. Edwards was capable of understanding the nature of a marriage within the paradigm you have discussed in May of 1975?" and he answered: "Yes, he was able to." He further testified that in his examination of Harold in December 1977, he questioned whether Harold was even mildly retarded, but at the subsequent examination, he concluded that Harold was mildly retarded, upper level. On cross-examination Dr. Menolascino was asked: "In your opinion, do you think that Harold Edwards understands the fact that he is liable for Mrs. Edwards' bills if she goes to a store and runs up some bills?" to which he replied: "Yes." He was then asked: "Do you think he understands the fact that if he gets a divorce he might have to pay alimony?" His reply to that question was: "I am not sure. I am not sure. * * *."

In addition to the medical witnesses who testified, there was also evidence adduced from various lay witnesses. Renne Edmunds, the guardian, testified that he first met Harold about April 8, 1975, although the date of the inception of the guardianship was October 18, 1972. At that time Harold was already under the care and guidance of ENCOR. Edmunds testified: "It was my conclusion that he [Harold] could not only manage a fund of thirty thousand, he couldn't manage the small purchases, as well." He testified that he refused to pay certain expenses

of the wedding because they were not compensable from guardianship funds. He admits that he was told about the marriage taking place, and that he had filed no action to prevent the marriage, which took place May 10, 1975. His annulment action was filed approximately 2 years later. Harry John Naasz, an adviser for ENCOR, who was Harold's supervisor, testified that he had assisted Harold in making preparations for the marriage including obtaining of blood tests and the marriage certificate. He had discussed the forthcoming wedding with Harold: "Can you tell us what you discussed concerning the marriage? A. We discussed what it would mean, what it would mean living together, sharing their lives. Q. And what did Harold express to you? A. He wanted to get married. Q. What did he say that led you to believe that he might understand marriage? A. He mentioned to me that he understood, too that it was a commitment to each other, that Inez would be living there." Mr. Naasz did admit in his testimony that at the beginning he did have some question in his mind about whether Harold understood marriage. He later referred the couple for marriage counseling.

David Bones, an employee of planned parenthood in Omaha and Council Bluffs, and also an ordained minister in the United Methodist Church, testified with reference to premarital sex counseling he had given to Harold and Inez on April 16, 1975. He testified: "As I recall, we talked some about the responsibility of economics, we talked about what kind of things they liked to do together, which is the common things we talked to most folks about. Q. Was there a response from Harold as to what kind of things they liked to do together? A. Well, the thing that I recall — and I cannot swear that it is a specific — specifically a statement made — that, you know, Harold and Inez together talked about their enjoying just being together and being together in

the sense of arms around each other, holding each other, holding hands, kidding one another, those things were a nice part of their experience as they were, and it appeared to us —." Bones testified that he basically completed his premarital sex course with Harold and Inez and that Harold appeared to understand it and nodded his head.

Reverend Verle Holsteen, who was the pastor of the First Baptist Church on Park Avenue in Omaha, and who was the officiating officer at the marriage between Harold and Inez, testified that he had known Inez since 1971 and Harold since 1974, and they attended his church regularly. He gave them premarital counseling and recalls having had three sessions with them. He asked Harold if he understood what they were talking about and Harold said yes. Reverend Holsteen performed the wedding ceremony and attended the reception which was held at the First Baptist Church parlor. He recalls church members being present, as well as friends of Harold and Inez from ENCOR and relatives from California. He stated: "My perception of their relationship to each other is that they get along well, that they enjoy being together. I have never had either one of them come to me and say, you know, I have a problem with the other. Q. Do you have an opinion on whether or not Harold understood the nature of marriage at the time you counseled him? * * * A. My feeling at the moment was that Harold understood as best he could, as anyone does." Reverend Holsteen testified on cross-examination: "I felt that Harold understood that if things followed through that he would be married to Inez." He was asked whether he had some doubt in his mind as to whether Harold understood what a marriage contract was all about and he replied: "By observing him I would say that he would not understand as much as other people what a marriage contract would be about. But I recognized, and 'I stand by

this, that they would get along well together." On redirect-examination he was asked: "Reverend, your testimony is, you did have some concern initially about his capacity? A. Yes, I did. Q. And is it also, then, your testimony that after talking to Harold and Inez your reservations were resolved? * * * A. I would say yes, they were resolved."

Also testifying at the trial was Elizabeth Cartwright, an employee of ENCOR, who monitors Harold and Inez' finances. She testified that when Harold gets paid at the Douglas County Hospital he signs his check, takes it to the bank, deposits all the money except $40, and gives Inez $20 and he keeps $20. She does not have to go to the bank with him. Elizabeth Cartwright also testified that Inez is quite a bit sharper than Harold and she helps him around. She also testified about an incident involving the loss of Harold's wedding ring. She stated: "Just recently Harold lost his wedding band and he called me up at work and was very much upset and stated that he lost his wedding band, and he said to me that it was exchanged to him on his wedding day, Inez gave it to him, he wanted another wedding band. So in talking with Inez and Harold they came to the conclusion that they would purchase another one at Crossroads, and they withdrew money from their savings account for the first time and purchased a wedding band. Harold selected it." She also testified, however, that Harold cannot figure his finances and needs assistance.

The final witness offering testimony at the trial was John Taylor, personnel director for the Civil Service Commission for Douglas County. He testified that Harold was first employed by the Douglas County Hospital on February 16, 1970, in the food service department, and that Harold has been promoted since and has received pay increases since February 1970, reflecting good job performance. Neither party to the marriage testified at the trial.

We now examine some established rules of law which we believe are applicable to this case. We first consider the nature of the marriage contract. Section 42-101, R. R. S. 1943, provides: "In law, marriage is considered a civil contract, to which the consent of the parties capable of contracting is essential." Although by statute, marriage is referred to as a "civil contract," we have held: "That it is not a contract resembling in any but the slightest degree, except as to the element of consent, any other contract with which the courts have to deal, is apparent upon a moment's reflection. * * * What persons establish by entering into matrimony, is not a contractual relation, but a social *status*; and the only essential features of the transaction are that the participants are of legal capacity to assume that *status*, and freely consent so to do." University of Michigan v. McGuckin, 64 Neb. 300, 89 N. W. 778 (1902). Also, in Willits v. Willits, 76 Neb. 228, 107 N. W. 379 (1906), we stated that while our law defines marriage as a civil contract, it differs from all other contracts in its consequences to the body politic, and for that reason in dealing with it or with the status resulting therefrom the state never stands indifferent, but is always a party whose interest must be taken into account. See, also, Collins v. Hoag & Rollins, 122 Neb. 805, 241 N. W. 766 (1932).

Another statutory provision of which we must take cognizance in this appeal is section 42-103, R. R. S. 1943, which provides: "Marriages are void * * * (2) when either party, at the time of marriage, is insane or mentally incompetent to enter into the marriage relation; * * *." This statute was reiterated, and other applicable rules with reference to competency to enter into a marriage relationship were reviewed in Homan v. Homan, 181 Neb. 259, 147 N. W. 2d 630 (1967), wherein we stated: "The petition alleged that the ward was mentally incompetent at the time of marriage. By statute a marriage is void 'when

either party is insane or an idiot at the time of marriage, and the term idiot shall include all persons who from whatever cause are mentally incompetent to enter into the marriage relation.' § 42-103, R. S., Supp., 1965.

"A marriage contract will not be declared void for mental incapacity to enter into it unless there existed at the time of the marriage such a want of understanding as to render the party incapable of assenting thereto. Fischer v. Adams, 151 Neb. 512, 38 N. W. 2d 337. Mere weakness or imbecility of mind is not sufficient to void a contract of marriage unless there be such a mental defect as to prevent the party from comprehending the nature of the contract and from giving his fee [sic] and intelligent consent to it.

"Absolute inability to contract, insanity, or idiocy will void a marriage, but mere weakness of mind will not unless it produces a derangement sufficient to avoid all contracts by destroying the power to consent. Aldrich v. Steen, 71 Neb. 33, 98 N. W. 445; Adams v. Scott, 93 Neb. 537, 141 N. W. 148. A marriage is valid if the party has sufficient capacity to understand the nature of the contract and the obligations and responsibilities it creates. Fischer v. Adams, *supra*; Kutch v. Kutch, 88 Neb. 114, 129 N. W. 169.

\* \* \*

"A marriage is presumed valid, and the burden of proof is upon the party seeking annulment. Adams v. Scott, *supra*." See, also, Annotation, Mental capacity to marry, 82 A. L. R. 2d 1040; 4 Am. Jur. 2d, Annulment of Marriage, § 28, p. 460.

It is the general rule that the existence of a valid marriage is a question of fact. 52 Am. Jur. 2d, Marriage, § 166, p. 1011; 4 Am. Jur. 2d, Annulment of Marriage, § 87, p. 502; 55 C. J. S., Marriage, § 46, p. 919. In this case the trier of fact was the court and the court had all the foregoing evidence, summarized above, before it. Concededly, much of the evidence

with reference to the capacity of Harold to enter into the marriage contract was conflicting and disputed. An action to annul a marriage, being an action in equity, is governed by the provisions of section 25-1925, R. R. S. 1943, which provides: "In all appeals from the district court to the Supreme Court in suits in equity, wherein review of some or all of the findings of fact of the district court is asked by the appellant, it shall be the duty of the Supreme Court to retry the issue or issues of fact involved in the finding or findings of fact complained of upon the evidence preserved in the bill of exceptions, and upon trial de novo of such question or questions of fact, reach an independent conclusion as to what finding or findings are required under the pleadings and all the evidence, without reference to the conclusion reached in the district court or the fact that there may be some evidence in support thereof." However, it is also the well-established rule that where the evidence on material questions of fact is in irreconcilable conflict, this court will, in determining the weight of the evidence, consider the fact that the trial court observed the witnesses and their manner of testifying, and therefore must have accepted one version of the facts rather than the opposite. This rule has been applied both in annulment actions and in divorce actions. Fischer v. Adams, 151 Neb. 512, 38 N. W. 2d 337 (1949); Seybold v. Seybold, 191 Neb. 480, 216 N. W. 2d 179 (1974); Patton v. Patton, 203 Neb. 638, 279 N. W. 2d 627 (1979).

Applying this rule to the present case, we conclude, therefore, that the trial court was correct in dismissing the guardian's petition to annul the marriage of his ward, and that its action in this regard should be and hereby is affirmed.

AFFIRMED.

BOSLAUGH, CLINTON, and HASTINGS, JJ., concur in result.