ALICE CONSTANCE GUGGENMOS, APPELLEE, V. DONALD LEE
GUGGENMOS, APPELLANT.
359 N.W.2d 87

Filed December 7, 1984.   No. 83-713.

McQuillan & Spady, P.C., for appellant.

Paul D. Merritt, Jr., of McGinley, Lane, Mueller, O'Donnell & Merritt, P.C., for appellee.

BOSLAUGH, HASTINGS, CAPORALE, and GRANT, JJ., and COLWELL, D.J., Retired.

PER CURIAM.

This case began with the filing of a petition by Alice Constance Guggenmos, appellee, for dissolution of her marriage to appellant, Donald Lee Guggenmos, who cross-petitioned for an annulment. For ease in reading we shall hereafter refer to the parties by their respective forenames. The district court dismissed Donald's cross-petition, dissolved the marriage, awarded each party the property in her or his possession, and awarded Alice an attorney fee of $1,000. This appeal from those determinations presents three issues: (1) Whether Alice perpetrated a fraud sufficient to justify an annulment rather than a dissolution of the marriage; (2) Whether the trial court erred in its division of property; and (3) Whether the trial court erred in awarding Alice an attorney fee. We answer each question negatively and, accordingly, affirm.

We begin by examining the rules of law which apply to the various scopes of review involved in this case. In our most recent marriage dissolution case dealing with the standard of review in the division of property, *Gleason v. Gleason, ante* p. 629, 357 N.W.2d 465 (1984), we said we are required to try the case de novo on the record and reach independent conclusions on the issues without reference to the conclusions or judgment of the district court. However, in cases as recent as *Haase v. Haase*, 210 Neb. 371, 314 N.W.2d 270 (1982), and *Liss v. Liss*, 206 Neb. 587, 294 N.W.2d 341 (1980), we said that the distribution of property rests in the sound discretion of the trial court and would not be disturbed on appeal absent an abuse of discretion. See, also, *Dobesh v. Dobesh*, 216 Neb. 196, 342 N.W.2d 669 (1984), stating that in considering whether a property settlement agreement is unconscionable, the review is de novo but weight is given to the fact that the trial court observed the witnesses. In *Steele v. Steele*, 201 Neb. 549, 270 N.W.2d 903 (1978), also dealing with the division of property, we observed that where the evidence is in conflict, we give weight to the fact that the trial court had the opportunity to observe and hear the witnesses.

We have also made similar statements with respect to

reviewing the award of attorney fees. For example, in *Pittman v. Pittman*, 216 Neb. 746, 345 N.W.2d 332 (1984), and *Pfeiffer v. Pfeiffer*, 203 Neb. 137, 277 N.W.2d 575 (1979), we indicated the matter was within the sound discretion of the trial judge, and his award would not be disturbed on appeal in the absence of an abuse of that discretion. Yet, in *Buker v. Buker*, 205 Neb. 571, 288 N.W.2d 732 (1980), we said the determination of attorney fees was to be reviewed de novo on the record.

A review de novo on the record is different than a review to determine whether an abuse of discretion has taken place. See *Puetz v. Puetz*, 211 Neb. 674, 319 N.W.2d 761 (1982). In a review de novo on the record, we reappraise the evidence as presented by the record and reach our own independent conclusions with respect to the matters at issue. A review to determine whether an abuse of discretion has taken place is much narrower. Although an abuse of discretion does not imply an improper motive, willful purpose, or intentional wrong, it does require the reasons or rulings of the trial judge to be clearly untenable and to deprive a party of a substantial right such as to amount to a denial of justice. *Pettegrew v. Pettegrew*, 128 Neb. 783, 260 N.W. 287 (1935).

Such confusion as may exist as to the appropriate standards of review arises not from the fact that the various statements we have made are inconsistent as might first appear, for they are not, but, rather, from the fact that we have apparently not stated the rule completely in any one case. There is no inconsistency in saying a matter is initially entrusted to the sound discretion of the trial judge and that on appeal we review the record de novo to determine whether that discretion has been abused. That is to say, we do not defer to the findings of the trial judge in determining whether there has been an abuse of discretion, but, rather, make our own appraisal of the record to determine whether the results obtained are untenable such as to have denied justice.

To remove any doubt as to the proper standard of review, we now state that the division of property and the awarding of attorney fees in marriage dissolution cases are matters initially entrusted to the sound discretion of the trial judge, which matters, on appeal, will be reviewed de novo on the record and

affirmed in the absence of an abuse of the trial judge's discretion. In our de novo review, where the evidence is in conflict, we will give weight to the fact that the trial judge observed and heard the witnesses and accepted one version of the facts rather than another.

An action to annul a marriage is equitable in nature. As such, it is our duty on appeal to retry the issue or issues of fact complained of de novo on the record and reach independent conclusions without reference to the conclusions reached by the trial judge, giving weight, where the evidence is in conflict, to the fact that the trial judge observed and heard the witnesses and accepted one version of the facts rather than another. Neb. Rev. Stat. § 25-1925 (Reissue 1979); *Edmunds v. Edwards*, 205 Neb. 255, 287 N.W.2d 420 (1980).

An annulment will be granted only in the presence of one or more of the grounds enumerated in Neb. Rev. Stat. § 42-374 (Reissue 1978), which include fraud. A marriage is presumed valid, and the burden of proving otherwise is upon the party seeking the annulment. *Edmunds v. Edwards, supra.*

*Zutavern v. Zutavern*, 155 Neb. 395, 52 N.W.2d 254 (1952), instructs us as to the type of fraud required to vitiate a marriage:

> The fraud that vitiates a marriage contract does not lend itself to definitive statement automatically resolving every case. It is not every kind and degree of fraud that affords cause for setting aside the contract. The law differentiates between fraud in the essentials of the marriage relation and deceptive arts to which some persons resort with a view to an advantageous marriage by placing their accomplishments, character, and circumstances in a too optimistic view. While these constitute a species of fraud, they do not afford a basis for destruction of the marriage. However, if there is a deception as to some fact whose existence or non-existence may affect in some certain way the very essence of the marriage relation, resulting in a lawful marriage which practically operates as a fraud upon the deceived spouse, and the existence or non-existence of the fact thus concealed or misrepresented must operate as between the parties to the marriage to prevent some essential purpose thereof and result in a

practical destruction of that relation, there exists such fraud as the law contemplates and such as renders the marriage contract subject to annulment.

*Id.* at 398-99, 52 N.W.2d at 257-58.

With the foregoing rules in mind we determine the following to be the facts.

Although living in different Nebraska towns, Donald and Alice first met in 1976, when each had another spouse. Notwithstanding their respective marriages, they entered into a sexual relationship with each other beginning sometime in 1978 or 1979. This relationship began to wane when Alice was divorced from her prior husband in the spring of 1979, and came to an end about the time Donald received a divorce from his prior wife in June of 1980.

Before this first breakup, Donald provided Alice with various sums of money and items of personalty which he characterized both as loans and gifts. Although he made demand for repayment of the money in November 1980 and had his attorney send a letter to Alice suggesting that the parties work something out, Donald testified that he had given the money and personalty to Alice at her specific request; that he had never discussed repayment or return of the personalty with her; that there were no arrangements for repayment; and that Alice had never offered to repay any sums to him. Nonetheless, Alice did eventually return an automobile to Donald after their 1980 separation. No other transfers of personalty were made following this first breakup, and Donald made no further demand for payment.

In April 1981 Alice apologized to Donald for her prior behavior, agreed to marry him, and the parties resumed their sexual relationship. Donald testified he made clear to Alice that he desired a long-term marriage. The record does not tell us, however, what Alice's response, if any, may have been.

At the time Donald and Alice were making their plans to be married, Donald knew that Alice was living with a Larry Pierce. In April and again in May, Donald and Alice discussed when Pierce would be moving out of Alice's house. Pierce finally moved out in August 1981, approximately a week before the marriage ceremony between Donald and Alice, which took

place August 21, 1981. There is nothing in the record to indicate that Donald made further inquiries about Pierce prior to the marriage, and, in fact, Donald testified that he knew, or surmised, that Pierce had not moved out of Alice's house as quickly as Alice had promised.

Prior to the marriage, Donald and Alice agreed that Alice would live in Ogallala, where she had been living for some time, while Donald would live at his ranch near Dunning, approximately 150 miles from Ogallala. It was decided that Donald would visit Alice on Wednesdays and Alice would spend weekends with Donald on his ranch. Alice did in fact make such visits, although not as frequently as Donald had wished. On these visits she frequently brought members of her family with her. Later, in November 1981, Donald purchased a house in Ogallala in which Alice, but not Donald, lived.

Although Donald complained that on only one occasion did Alice use Guggenmos as her surname, the record establishes that Donald and Alice had agreed before the marriage that she would continue to use Norris as her surname.

Donald and Alice's rather unorthodox state of semiunited bliss encountered difficulties when Donald visited Alice at Christmas in 1981 and overheard a telephone conversation between her and Pierce, in which she and Pierce professed their love for one another. When Donald confronted Alice about the conversation, she made light of it, explaining that Pierce was "just drunk." Donald had been aware of several other phone calls between Alice and Pierce and had observed Pierce near Alice's residence in Ogallala on two prior occasions.

The day after Christmas Donald returned to his ranch but continued to visit Alice in Ogallala. During these visits, Alice was "cold" and "wouldn't hardly speak." Their sexual encounters ended in January 1982. Alice visited Donald one more time, in February 1982, and these proceedings were commenced the following April.

Donald contends the foregoing evidence establishes that Alice made several material misrepresentations which duped and induced him into marrying her. Essentially, he complains that Alice did not intend to live with him, did not visit him at his ranch as often as had been agreed, brought other members of

her family with her when she did visit, did not use the Guggenmos surname, and did not terminate her relationship with Pierce. The difficulty with those complaints, from Donald's point of view, is that he knew prior to entering into the marriage that Alice was not going to be living with him on a day-to-day basis; there were no promises that she would not bring others with her when she visited him; he knew well before the marriage that Alice had not ended her relationship with Pierce as promptly as Donald had contemplated; and they had agreed she would not use the Guggenmos surname. Under the circumstances it cannot be said that any of the things about which Donald complains goes to the "essence" of the marriage relationship.

Donald has failed to sustain his burden of proving fraud such as to warrant the granting of an annulment.

The assignment of error with respect to the division of property relates to the failure of the trial court to return to Donald the money he paid and personalty he transferred to Alice prior to the marriage. He argues that had the court granted an annulment as it should have done, then the money and personalty would have been returned to him, as the court would have restored the parties to the position in which they were prior to the marriage. As we have seen, the premise that an annulment should have been granted is wrong; it is therefore unnecessary to discuss what the property and monetary consequences would have been in such an instance.

There is no mathematical formula for dividing property when a marriage is dissolved. Such awards are to be determined by the facts in each case. *Gleason v. Gleason, ante* p. 629, 357 N.W.2d 465 (1984); *Whitney v. Whitney,* 214 Neb. 565, 334 N.W.2d 799 (1983); *Lord v. Lord*, 213 Neb. 557, 330 N.W.2d 492 (1983). The ultimate test is one of reasonableness. *Burger v. Burger*, 215 Neb. 699, 340 N.W.2d 400 (1983).

This is not a case such as presented in *Andersen v. Andersen*, 204 Neb. 796, 285 N.W.2d 692 (1979), wherein we held that gifts of jewelry given during the course of a long marriage were to be treated as part of the marital estate. Money spent or gifts made in anticipation of marriage ordinarily will not be reimbursed when dissolution is granted and will not be considered in

dividing the marital property. *Ritter v. Ritter*, 205 Neb. 668, 289 N.W.2d 526 (1980).

Under the circumstances we conclude on our de novo review of the record that the trial court did not abuse its discretion in decreeing that each party be awarded the property in her and his respective possession at the time of the dissolution.

This, then, brings us to the matter of the attorney fee. We have held that in an action for dissolution of marriage, the award of an attorney fee involves a consideration of such factors as the nature of the case, the amount involved in the controversy, the services actually performed, the results obtained, the length of time required for preparation and presentation of the case, the novelty and difficulty of the questions raised, the customary charges of the bar for similar services, the earning capacity of the parties, and the general equities of the case. *Pittman v. Pittman,* 216 Neb. 746, 345 N.W.2d 332 (1984); *Pfeiffer v. Pfeiffer,* 203 Neb. 137, 277 N.W.2d 575 (1979).

The trial judge concluded that due to the novel nature of the legal questions presented, the length of the trial, 1 day, and the pretrial preparation required, Alice was entitled to an attorney fee as aforesaid. Although we conclude that Alice's request for the award of an attorney fee in this court is to be denied, we cannot conclude upon a de novo review of the record that the trial judge abused his discretion in awarding her one for the services of her attorney in the trial court.

AFFIRMED.