Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
10/22/2021 08:09 AM CDT

Mark J. Malousek, successor to Eric Rees,
as Special Administrator of the Estate
of Molly R. Stacey, deceased, et al.,
appellees and cross-appellants, v.
Steven Greg Meyer and Mark
A. Meyer, appellants and
cross-appellees.

___ N.W.2d ___

Filed July 30, 2021.    No. S-20-470.

1. **Actions: Parties: Standing: Jurisdiction.** The question of whether a
   party who commences an action has standing and is therefore the real
   party in interest presents a jurisdictional issue.
2. **Standing: Jurisdiction: Judgments: Appeal and Error.** Standing is
   a jurisdictional component of a party's case, because only a party who
   has standing may invoke the jurisdiction of a court; determination of a
   jurisdictional issue which does not involve a factual dispute is a matter
   of law which requires an appellate court to reach its conclusions inde-
   pendent from those of a trial court.
3. **Declaratory Judgments.** An action for declaratory judgment is sui
   generis; whether such action is to be treated as one at law or one in
   equity is to be determined by the nature of the dispute.
4. **Appeal and Error.** In a bench trial of a law action, the trial court's
   factual findings have the effect of a jury verdict and will not be set aside
   on appeal unless they are clearly wrong.
5. **Trial: Witnesses.** In a bench trial of an action at law, the trial court is
   the sole judge of the credibility of the witnesses and the weight to be
   given their testimony.
6. **Equity: Evidence: Appeal and Error.** A case in equity is reviewed de
   novo on the record, subject to the rule that when credible evidence is in
   conflict on material issues of fact, an appellate court will consider and
   may give weight to the fact that the trial court observed the witnesses
   and accepted one version of the facts over another.

7. **Appeal and Error.** In a review de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions concerning the matters at issue.

8. **Contracts: Undue Influence: Proof.** The elements necessary to warrant the rejection of a written instrument on the ground of undue influence are (1) that the person who executed the instrument was subject to undue influence, (2) that there was opportunity to exercise undue influence, (3) that there was a disposition to exercise undue influence for an improper purpose, and (4) that the result was clearly the effect of such undue influence.

9. **Undue Influence: Proof.** Because undue influence is often difficult to prove with direct evidence, it may be reasonably inferred from the facts and circumstances surrounding the actor: his or her life, character, and mental condition.

10. **Undue Influence.** Mere suspicion, surmise, or conjecture does not warrant a finding of undue influence; instead, there must be a solid foundation of established facts on which to rest the inference of its existence.

11. **Trial: Witnesses: Testimony.** Witness credibility and the weight to be given a witness' testimony are questions for the trier of fact.

12. **Contracts: Mental Competency: Proof.** In order to set aside a written instrument for want of mental capacity on the part of the person executing it, the burden of proof is upon the party asserting incapacity to establish that the mind of the person was so weak or unbalanced when the instrument was executed that the person could not understand and comprehend the purport and effect of what he or she was doing.

13. **Contracts: Marriage: Mental Competency.** A marriage contract will not be declared void for mental incapacity to enter into it unless there existed at the time of the marriage such a want of understanding as to render a party incapable of assenting thereto.

14. \_\_\_\_: \_\_\_\_: \_\_\_\_. Mere weakness of mind is not sufficient to void a contract of marriage unless there be such a mental defect as to prevent the party from comprehending the nature of the marriage contract and from giving free and intelligent consent to it.

15. **Contracts: Marriage.** A marriage is valid if a party has sufficient capacity to understand the nature of the contract and the obligations and responsibilities it creates.

16. **Actions: Trusts: Equity.** Actions to declare a resulting trust are in equity.

17. **Trusts: Conveyances: Presumptions: Intent: Words and Phrases.** A resulting trust is one raised by implication of law and presumed always to have been contemplated by the parties; the intention of the resulting trust is to be found in the nature of their transaction, but not expressed in deed or instrument of conveyance.

18. **Trusts: Property: Consideration.** Where a transfer of property is made to one person and the purchase price or consideration is paid by another person, a resulting trust arises in favor of the person who made the payment or provided consideration.

19. **Trusts: Proof.** The burden is on the one claiming the existence of a resulting trust to establish the facts upon which it is based by clear and satisfactory evidence.

Appeal from the District Court for Sarpy County: George A. Thompson, Judge. Affirmed in part, and in part reversed and remanded with directions.

Travis M. Jacott, Patrick J. Sullivan, and C.G. (Dooley) Jolly, of Adams & Sullivan, P.C., L.L.O., for appellants.

Thomas M. White and Amy S. Jorgensen, of White & Jorgensen, for appellees.

Mark J. Malousek, pro se.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Papik, J.

Steven Greg Meyer (Greg) and his adult son, Mark A. Meyer, appeal an order of the district court for Sarpy County that declared the marriage between Greg and Molly R. Stacey, deceased, to be null and void and ordered them to execute instruments to relinquish certain property interests they obtained from Molly before her death. They contend that Molly's children lack standing to challenge certain transactions at issue and that the party that had standing to challenge those transactions, the special administrator of Molly's estate, did not join the action. Greg and Mark also allege that the district court incorrectly found that Molly lacked the requisite mental capacity and acted under undue influence. Finding no error by the district court on these issues, we affirm in part.

Molly's children and the special administrator of her estate cross-appeal, assigning that the district court erred in failing

to rule that a boat Molly purchased and titled in Mark's name should be regarded as held in a resulting trust by Mark for Molly's benefit. We agree and in part reverse, and remand with directions.

## I. BACKGROUND

Molly and Greg began living together, unmarried, in 2009. Each had children from previous marriages. In 2015, Molly was diagnosed with cancer and underwent treatment, but the cancer spread and her condition deteriorated. On October 12, 2017, with Greg's involvement, Molly made Greg a joint owner on two of her bank accounts. On October 14, Molly and Greg married. In the following days, again with Greg's involvement, Molly changed beneficiary designations on other accounts and an insurance policy to favor Greg, rather than her adult children, or to include Mark; executed quitclaim deeds in both her homes to vest ownership in Greg upon her death; and changed a recently executed power of attorney from her son to Greg. On October 23, Molly died intestate. She was 60 years old.

Molly's adult children, Austin J. Stacey (A.J.) and Courtney R. Stacey, believed that Molly's actions in October 2017 resulted from undue influence and that she lacked capacity due to her illness. They filed a declaratory judgment action in the district court against Greg and Mark seeking declarations that all of the above property interest changes and the marriage of Molly and Greg were void and invalid. Greg and Mark responded with motions and pleadings alleging that Molly's children were not the real parties in interest and seeking dismissal of the complaint for lack of standing. The district court denied the motions to dismiss.

Later in the action, Molly's children obtained leave to file an amended complaint in which the special administrator of Molly's estate would be joined as an additional plaintiff. In the ensuing second amended complaint, Molly's children and the special administrator added allegations that a boat Molly

had purchased was titled in Mark's name by Molly in 2015 and that the boat belonged to Molly when she died.

Following a trial, the district court generally found in favor of Molly's children and the special administrator, whom the court recognized as the plaintiffs. It expressly found their witnesses more credible than Greg and Mark's and determined that Molly's children and the special administrator had met their burden of proving that the marriage and the October 2017 transactions were procured by undue influence by Greg or his family and while Molly lacked mental capacity. However, the district court concluded that the boat purchased by Molly and titled in Mark's name was a gift and declined to find that it amounted to a resulting trust. It declared the marriage null and void and ordered Greg and Mark to execute any instruments necessary to convey interests they had acquired to Molly's children and her estate, with the exception of the boat.

Greg and Mark appealed, asserting that the district court had erred in its findings that did not involve the boat. Molly's children and the special administrator have cross-appealed to challenge the district court's ruling as to the boat.

## II. ASSIGNMENTS OF ERROR

Greg and Mark assign that the district court erred in (1) holding that Molly's children had standing to challenge the validity of the real and personal property transfers Molly made, (2) holding that Molly's estate is a party to the action, (3) applying a greater weight of the evidence standard to claims of undue influence and lack of mental capacity rather than a clear and convincing evidence standard, and (4) making the factual finding that Molly lacked mental capacity and was subject to undue influence.

On cross-appeal, Molly's children and the special administrator assign that the district court erred in (1) imposing a duty on them to prove that the boat was not a gift from Molly to Mark to avoid it being held in a resulting trust and (2) failing to hold that Mark held title to the boat as trustee for Molly's benefit.

## III. STANDARD OF REVIEW

We address the relevant standard of review in each subsection of the analysis below.

## IV. ANALYSIS

### 1. Jurisdiction

[1] In Greg and Mark's first two assigned errors, they contend that Molly's children did not have standing to challenge Molly's real and personal property transfers and that the party with standing to challenge those transactions—the special administrator of Molly's estate—was not a party to the action. The question of whether a party who commences an action has standing and is therefore the real party in interest presents a jurisdictional issue. *Valley Boys v. American Family Ins. Co.*, 306 Neb. 928, 947 N.W.2d 856 (2020). Therefore, we consider this issue first.

#### (a) Additional Background

As noted above, Molly's children alone initiated the declaratory judgment action. They did so before any special administrator or personal representative was appointed for Molly's estate. However, after Greg and Mark filed answers and motions to dismiss alleging that Molly's children were not real parties in interest and lacked standing to commence the suit, Molly's children sought and obtained leave to add the special administrator of Molly's estate, Eric Rees, as a plaintiff. Their motion asserted that the special administrator was recently appointed, had an interest in the proceeding, and was a necessary party.

The resulting second amended complaint named the special administrator as a plaintiff and stated that his "presence in this action is nominal only, and solely for the purpose of allowing an action to proceed to determine the nature and extent of the probate estate of Molly." All requests for relief and supporting legal conclusions were by "Plaintiffs." Rees signed the second amended complaint as special administrator, along with the attorney representing Molly's children.

At the opening of trial, the district court invited the parties to address preliminary matters. Mark Malousek, Rees' successor as special administrator, identified himself as acting special administrator and responded, "I hereby will adopt the arguments and claims of [Molly's children]." Greg and Mark's counsel objected, referred to their arguments based on standing, and noted that the estate had not filed any "affirmative pleadings."

In its order following trial, the district court explained that it was not persuaded by Greg and Mark's arguments regarding standing. It recognized Molly's estate as a full party to the action that had, at the beginning of trial, adopted all claims made by Molly's children.

### (b) Standard of Review

[2] Standing is a jurisdictional component of a party's case, because only a party who has standing may invoke the jurisdiction of a court; determination of a jurisdictional issue which does not involve a factual dispute is a matter of law which requires an appellate court to reach its conclusions independent from those of a trial court. *Egan v. County of Lancaster*, 308 Neb. 48, 952 N.W.2d 664 (2020).

### (c) Analysis

Greg and Mark's argument that Molly's children lacked standing to challenge Molly's real and personal property transfers is based on our decision in *In re Estate of Hedke*, 278 Neb. 727, 775 N.W.2d 13 (2009). In that case, we held that under the Nebraska Probate Code, the right and duty to sue and recover assets for an estate reside in the estate's appointed personal representative, not the devisees. *Id.* We went on to explain that the Nebraska Probate Code allows for the appointment of a special administrator to administer an estate when a personal representative cannot or should not act. There is no dispute that a special administrator was appointed to administer Molly's estate.

We agree with Greg and Mark that under *In re Estate of Hedke*, any claims to recover assets for Molly's estate could have been brought only by the special administrator of the estate. For reasons we will explain, however, that does not lead to the conclusion that the district court lacked jurisdiction.

First, Greg and Mark do not dispute that Molly's children were the proper parties to assert some of the claims at issue notwithstanding our decision in *In re Estate of Hedke*. For example, the operative complaint sought to void changes to the beneficiary designations on Molly's life insurance policy from Molly's children alone to include Mark as well. Life insurance benefits are generally a type of nonprobate transfer and would thus not pass through Molly's estate. See, e.g., *In re Trust of Rosenberg*, 273 Neb. 59, 727 N.W.2d 430 (2007). Consistent with that principle, we have held that a challenge to a change to a life insurance beneficiary designation is properly brought by the person who would be entitled to the proceeds if the beneficiary change is voided. See *Goff v. Weeks*, 246 Neb. 163, 517 N.W.2d 387 (1994). In this case, Molly's children are the parties that would be entitled to the proceeds if the beneficiary changes are voided.

Molly's children did initially seek to void other instruments with the goal of recovering assets for Molly's estate, and only the special administrator could pursue this relief under *In re Estate of Hedke*. However, Molly's children and the special administrator contend that because the special administrator became a plaintiff with the filing of the second amended complaint, the special administrator's initial absence does not pose a jurisdictional problem.

Greg and Mark argue to the contrary, insisting that the special administrator was something less than a full party to the action. In support of this contention, Greg and Mark point out that the second amended complaint stated that the special administrator's "presence in this action is nominal only, and solely for the purpose of allowing an action to proceed to determine the nature and extent of the probate estate of Molly."

They also observe that many allegations in the complaint are phrased as allegations of "A.J. and Courtney," rather than of the special administrator or all the plaintiffs. This shows, Greg and Mark claim, that the special administrator "explicitly refused to join the claims raised by [Molly's children] of undue influence and lack of mental capacity." Brief for appellants at 16.

We disagree with Greg and Mark and find that the special administrator joined in the lawsuit and asserted claims to recover assets for Molly's estate. We understand the reference in the second amended complaint to the special administrator's presence being "nominal" as merely conveying that the special administrator was participating in the action in his capacity as special administrator. We likewise do not draw the inference Greg and Mark draw from the fact that certain allegations are phrased as allegations of "A.J. and Courtney." In any event, any notion that the special administrator was not a party to the action and asking the district court to restore property to Molly's estate is undercut by several other facts. First, in the motion in which they sought leave to file the second amended complaint, Molly's children asserted that the special administrator was recently appointed, had an interest in the proceeding, and was a necessary party. Further, the second amended complaint identified the special administrator as a plaintiff, was signed by the special administrator as a plaintiff, and framed each of its prayers for relief as being asserted by "[p]laintiffs." Taken as a whole, the second amended complaint demonstrates that the special administrator joined the lawsuit as a plaintiff to assert claims to recover assets for Molly's estate.

The most that Greg and Mark can argue regarding these issues is that prior to the filing of the second amended complaint, Molly's children were asserting some claims that could only be asserted by the special administrator. On this point, we can agree that in the initial stage of this case, neither Molly's children nor the district court demonstrated a clear grasp of the rule recognized in *In re Estate of Hedke*, 278 Neb. 727, 775 N.W.2d 13 (2009). Molly's children purported to assert

certain claims that could only be asserted by the special administrator. And when Greg and Mark brought this issue to the attention of the district court via a motion to dismiss, the district court initially failed to recognize it.

These early missteps do not, however, call into question the district court's authority to enter judgment on the validity of the real and personal property transfers Molly made. Even if the district court should have dismissed claims governed by *In re Estate of Hedke* to the extent Molly's children alone were attempting to assert them, the fact that claims are initially asserted by the wrong party does not require the immediate, permanent dismissal of such claims, let alone the entire action. See Neb. Rev. Stat. § 25-301 (Reissue 2016) ("[a]n action shall not be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for joinder or substitution of the real party in interest"). See, also, *Concerned Citizens v. Department of Environ. Contr.*, 244 Neb. 152, 505 N.W.2d 654 (1993) (reversing order dismissing petition with prejudice, in part, because defects in allegations regarding standing were curable).

In response to Greg and Mark's motion to dismiss, the district court could and should have noted that Molly's children lacked standing to recover assets for the estate and afforded leave for the special administrator to join the action as a plaintiff. Despite the district court's failure to do so, the special administrator did eventually join the lawsuit. Once the duly appointed special administrator joined, the proper parties were present and the district court had jurisdiction to rule on all the claims asserted. This is true even though the special administrator had not been appointed when Molly's children initiated the action. See § 25-301 ("[j]oinder or substitution of the real party in interest shall have the same effect as if the action had been commenced by the real party in interest"). See, also, *Walker v. Probandt*, 29 Neb. App. 704, 958 N.W.2d 459 (2021). Greg and Mark's jurisdictional assignments of error lack merit.

## 2. LACK OF MENTAL CAPACITY
### AND UNDUE INFLUENCE

Greg and Mark's remaining assignments of error challenge the district court's determination that the marriage and the various transactions involving Molly's homes, bank accounts, and beneficiary designations should be declared invalid on the grounds that Molly lacked the requisite mental capacity and that undue influence was exerted over her. For the reasons explained below, however, we are not persuaded.

### (a) Additional Background

At trial, Molly's children and the special administrator presented evidence that in 2009, Greg began living in Molly's Nebraska residence with her and her children, who were then teenagers. Relationships in the household were generally harmonious. Greg's son, Mark, was an adult at that time and lived elsewhere. Several of the witnesses of Molly's children and the special administrator testified that Molly had a close relationship with her children and that they had always been her top priority.

In 2010, Molly began wearing a ring she had purchased. Molly consistently characterized the ring to friends and family as a commitment ring, and through the years, she repeatedly disclaimed plans to marry again.

Greg, born in 1955, had not had a job with regular income since 2002. Molly had assets from her divorce settlement and later inherited assets from her mother. After moving in with Molly in 2009, Greg relied on her to provide for all of his living expenses, and he cooked and did housework.

Several witnesses testified that Molly had complained about supporting Greg financially. In particular, Molly expressed that Greg spent too much of her money on alcohol, and she was annoyed when he offered drinks to friends and trips to Florida to his son, Mark, and expected Molly to pay for it. There was also testimony that in 2013, Greg asked to be included on the deed to a residence Molly purchased in Florida; Molly refused. A.J. recalled that when Molly and Greg were drinking, Greg

would bring up the subject of wanting his name on the Florida house or wanting more money, and Molly did not like it. A.J. testified that multiple times Greg said he wanted money or to be on a policy or a bank account, but Molly only wanted her name on her assets. A.J. testified that Greg had tried to obtain a credit card in his name on Molly's account, but Molly would not allow it because Greg did not have his own money and she did not want him "going crazy spending money." A friend testified that during the last 4 years of Molly's life, Molly said that Greg was "le[e]ching" or "mooching" off of her.

Molly was diagnosed with mouth cancer in December 2015 and underwent surgeries and other treatment. Molly did not have a will, but Molly's friends and family testified that Molly had always maintained, as late as September 2017, the month before she died, that she wanted her assets divided equally between A.J. and Courtney when she died, even if the operative financial instruments gave more to Courtney. There was testimony that Molly had remarked to some friends and family as late as August 2017 that she supposed she should leave Greg $50,000, but nothing else. And about a year before her cancer diagnosis, Molly had rejected Greg's suggestion that she include Mark in her estate plan.

In June 2017, Molly contacted attorney Richard Whitworth about setting up health care and durable powers of attorney. Whitworth, who knew Molly from handling her mother's estate starting in 2011, testified that in June 2017, Molly was lucid. Molly said she wanted to name A.J. as attorney in fact, and she specifically said she did not want Greg to know about the matter. Molly later came to Whitworth's office to execute the powers of attorney documents. A.J. testified that Molly did not want Greg to know because she did not want to deal with the pressure of Greg's questions about her decision.

Whitworth asked Molly whether she needed any additional estate planning services, and Molly declined, saying that as long as she remained single, everything would pass to her children and that is what she wanted. According to Whitworth,

Molly made similar statements in his presence multiple times. At no time after executing the powers of attorney did Molly indicate to Whitworth that she had changed her mind about A.J.'s being the attorney in fact, nor did she inquire about how marriage would affect her plan to leave her property to her children.

There was testimony that despite Molly's illness, she was supportive of her children's career pursuits outside Nebraska— Courtney in Kansas City, Missouri, and A.J. in Florida. In 2017, both A.J. and Courtney spoke to Molly several times a week and made trips to Nebraska to visit her. In May and August 2017, Molly visited A.J.

Cari Tilson testified that she had been Molly's nail technician since 2006 or 2007 and did Molly's nails every 3 weeks. Tilson last worked on Molly's nails on September 14, 2017. Greg's sister, Ann Labart, drove Molly to the appointment, helped her into the salon, and stayed next to her. Tilson observed that Molly appeared very frustrated because anytime Molly "would say a word," Labart wanted to know what she had said. Tilson testified that Molly's body language indicated that Labart was too close to her, and at one point, Molly said to Labart, "[G]ive me a break. Let me breathe."

Labart testified that Molly slept often during her last weeks, but she denied that Molly was "mentally totally out of it." Labart testified that Greg fed Molly and controlled the narcotics for Molly's pain. Labart denied that Molly was being given drugs beyond what was prescribed. Labart testified that she was paying for Greg's legal fees and supporting him financially and would continue to do so regardless of the outcome of the litigation.

Molly's longtime close friend Teri Troilo testified that she last saw Molly the second week of September 2017. Molly told Troilo that Nebraska did not have common-law marriage and that therefore, in the absence of a will, Molly's money would go to her children as she had arranged it. Molly also told Troilo that at that time, she still had no intention of ever

getting married again and, in the absence of any marriage, her children would be taken care of financially when she died.

After her visit in September 2017, Troilo called Molly's telephone several times, at least once a week. Greg always answered Molly's telephone and usually told Troilo that Molly was sleeping. Troilo was only able to speak to Molly one time, and Molly was only able to respond "uh-huh" and "huh-uh." The subject of marriage did not come up. According to Troilo, Greg did not communicate to her that Molly was close to death.

A.J. visited Molly in mid-September 2017. Then in late September and early October 2017, when A.J. tried to call Molly, it was difficult to reach her. She often did not call back, and when she did, the calls were short and Molly was difficult to understand. At that time, Greg began to answer the telephone regularly rather than Molly. Greg would tell A.J. that Molly was tired or sleeping, update him on any appointments, and tell him that Molly was "holding her own." A.J. would ask to speak to Molly directly, and most of the time, Greg would say she was too tired or had just taken medication and was sleeping.

Todd Jensen testified that he was Greg's best friend and was at the Nebraska residence three or four times a week. Jensen testified that he observed Molly's condition gradually deteriorate during the last month of her life and that she lost her ability to focus or make normal decisions. He saw Molly and Greg on October 10, 2017. At that time, Molly did not know who Jensen was. When Jensen was there, neither Molly nor Greg mentioned plans to get married.

On October 12, 2017, Molly signed documents to convert her two bank accounts from her sole ownership to joint ownership with Greg. Bank manager Marcell Kalonga assisted with the transaction. He observed Greg and Molly enter the bank and testified that Molly appeared tired and sick and "couldn't even walk" and that Greg was "holding her [up]." In Kalonga's opinion, Molly needed to be in bed at home or hospitalized

because she did not seem to have the strength to do things on her own. Greg told Kalonga that he wanted to be added to Molly's account because they were engaged to be married in about a week, that Molly was dying, and that he had promised to marry Molly before she died. Kalonga testified that Molly had difficulty speaking to answer his questions. According to Kalonga, contrary to normal procedure, "[a]ll the conversation was 100 percent done by" Greg. Kalonga was uncomfortable with the situation, and at some point, he asked Greg to step out so that Kalonga could speak to Molly, but Greg "couldn't." Kalonga testified that despite his misgivings, he proceeded with the transaction because Greg and Molly were cohabitating and soon to be married. Greg held Molly's hand to help her sign documents. After Greg and Molly left, Kalonga told some coworkers about the incident because he did not feel it was "right." In his opinion, Greg was controlling what Molly was doing that day and she was acting against her wishes.

Courtney recalled speaking to Molly on the same day, which was Courtney's birthday. Courtney testified that previously, Molly typically contacted her on her birthday, but in 2017, she did not. Courtney became concerned and called Molly in the late afternoon. Greg answered and told Courtney that they had been running errands and that Molly was tired. Courtney next spoke to Molly but could not understand anything she said because her speech was garbled. That was the last time Courtney was able to talk with Molly.

After October 12, 2017, Greg answered the telephone most of the time when Courtney called, or there was no answer. When Courtney asked to speak to Molly, Greg would tell Courtney that Molly was sleeping and offer to have Molly call Courtney back, but she never did, which was not typical for Molly.

On October 14, 2017, Greg and Molly were married in a ceremony at Molly's Nebraska residence. Labart testified that she made the wedding arrangements and kept it a secret from Molly's children because Molly made her promise not to tell them. Labart testified that the wedding was attended by

her, Mark and his wife, and Labart's husband. Labart arranged for her boss to officiate and told him to keep the wedding a secret.

On October 15, 2017, Molly signed documents to change beneficiaries on her accounts with Minnesota Life. For a life insurance policy with a death benefit of $250,000, she changed the beneficiary designations from A.J. and Courtney in equal shares to A.J., Courtney, and Mark in equal shares. For a retirement account valued at approximately $550,000, Molly changed the beneficiary from Courtney alone to Greg, A.J., and Courtney, with Greg alone receiving half and A.J. and Courtney each receiving one fourth. As to a mutual fund account valued at about $180,000, Molly changed the beneficiary from Courtney to Greg.

On October 16, 2017, Molly signed documents to change the beneficiary designation on her National Life annuity policy from Courtney to Greg only. The change of beneficiary forms were not signed by a witness. The policy had a cash value of about $65,000.

On October 20, 2017, Molly signed quitclaim deeds for the Nebraska residence, valued at approximately $182,000, and the Florida residence, valued at approximately $408,580 with a mortgage of approximately $200,000. The deeds changed the properties from Molly's sole ownership to joint ownership with Greg, with right of survivorship. On the same day, Molly signed durable powers of attorney documents giving Greg the powers of attorney that she had previously given to A.J. Greg, Mark, and Labart's husband were present.

A.J. testified that his difficulty in getting Molly on the telephone increased dramatically toward the end of October 2017. That month, he called daily or every other day and talked to Molly once or twice only. If no one answered Molly's telephone, A.J. would call Greg's; Greg answered most of the calls, and if he did not, he called A.J. back. In October 2017, Greg never indicated to A.J. that Molly was very ill and that A.J. should come see her.

Troilo testified that a few days before Molly died, Greg called her to tell her Molly was going into hospice and stopping treatment. Greg told Troilo that she needed to make a plan to visit Molly. He did not tell Troilo at that time that Molly had taken a sudden turn for the worse, nor did he tell her that he and Molly were thinking of marrying or had married.

Molly's longtime friend Kristi Rieke testified that she saw Molly on October 21, 2017, after Greg informed her that Molly was not doing well and that Rieke should see her as soon as she could. Rieke was unsure whether Molly recognized her. After Molly fell asleep, Greg said in conversation that Molly did not have a will. Greg said he planned to call for hospice care in a few days, and Rieke advised him to do it right away, as she did not believe Molly would live that long. Rieke believed Molly's children should have been there and asked Greg why they were not. Greg responded that they were busy. Upon Rieke's request, Greg agreed to give Rieke their telephone numbers but asked Rieke not to call them because he wanted to follow Molly's wishes. Rieke told Greg that Molly would want her children there. Rieke called Molly's children the following day; Courtney was already with Molly, and A.J. was on his way. A.J. and Courtney had been informed about Molly's condition after Rieke's visit.

A.J. testified that around the same time, he had asked Greg if he should come to see Molly, and Greg had said that he did not have to come or that Greg did not think he should. On October 21, 2017, Mark told A.J. in a text message that if A.J. wanted to come, he should. A.J. immediately tried to get a flight to Nebraska.

Courtney testified that she would always ask Greg about Molly's condition. Greg would answer that Molly was all right and putting up a good fight and that Greg was taking care of her. Greg did not inform Courtney until October 21, 2017, that Molly's condition was seriously deteriorating. Greg told Courtney that Molly was in hospice and that Courtney might want to visit her. Early the next morning, Courtney traveled

to Nebraska. Molly appeared frail and did not speak or move. She could only open her eyes, and Courtney was not sure that Molly could recognize her. The next day, October 23, Molly died before A.J. arrived.

The evening that Molly died, Greg told Courtney that they had married. Courtney testified that it seemed out of character for Molly not to share the information with her because they were very close and also that it surprised her that Greg did not tell her before the wedding.

The day after Molly died, A.J. learned that Greg and Molly had married. A.J. considered this to be out of character for Molly, who had always been open about her plans and her plans had never included marriage, especially to Greg. A.J. spoke to Molly's friends and family and learned that none of them were aware of the marriage ceremony in advance. Only Greg's friends and family knew about it.

Troilo testified that she learned of the marriage from Greg the night Molly died. In Troilo's opinion, if Molly had been in a lucid state, she would not have married without telling Troilo, especially considering their conversation about marriage in September 2017. Other friends of Molly's also testified that they were surprised to learn she had married Greg.

There was no formal assessment of Molly's mental functioning during October 2017 and no documented efforts to determine whether she could understand the importance of the specific decisions she made at that time; the focus was on the cancer and Molly's pain. A medical expert, a psychiatrist retained by Molly's children and the special administrator, reviewed Molly's medical records and the depositions of people who knew Molly and interacted with her in October 2017. He opined that although Molly experienced lucid intervals from October 12 to 20, during that timeframe she also periodically experienced delirium, which is a serious disturbance in mental abilities that results in confused thinking and disrupts memory, orientation, planning, organizing, motivation, communication, and awareness of the environment.

The medical expert retained by Molly's children and the special administrator identified several possible causes of delirium that Molly experienced in October 2017, noting that multiple causes were likely present at the same time, with interactive and additive effects. These included her metabolic condition, dehydration and malnutrition, the physical stress of progressive cancer, fatigue, side effects from treatment, possible undiagnosed infection, disrupted sleep patterns, anxiety and depression, emotional stress, and reduced oxygen. In addition, in October 2017, Molly was taking several medications identified as causes of delirium, including the narcotic pain medications fentanyl and oxycodone and an antianxiety medication called lorazepam. The fentanyl was administered continuously for 3 days at a time via a transdermal patch. In this medical expert's opinion, due to these factors, there were times in October 2017 when Molly lacked the mental capacity for decisionmaking and she was vulnerable to undue influence.

After the close of the case in chief for Molly's children and the special administrator, Greg and Mark proceeded with their evidence. According to Greg and Mark's evidence, on October 6, 2017, Molly and Greg obtained forms to change beneficiary designations on Molly's life insurance, retirement account, and mutual fund account. Both Molly's financial advisor and an attorney were present. They testified that Molly led the conversation and expressed that she wanted to leave $500,000 to her children through beneficiary designations and leave the Nebraska and Florida residences to Greg. Neither was concerned that Molly did not understand the significance of her actions or was influenced by Greg. The attorney informed Molly that if Greg's name was put on the deeds to the residences, Greg would have to pay inheritance taxes when Molly died, unless they were married. According to testimony presented by Greg and Mark's witness, Molly replied, "[T]hen we'll get married."

Greg and Mark presented the testimony of the officiant for Greg and Molly's October 14, 2017, wedding. He testified

that he spoke to Molly alone before the wedding and that she told him she wanted to get married that day and stand by Greg's side during the ceremony. It did not appear to him that Molly was being influenced, and he described the atmosphere as that of a familial, happy occasion.

Greg and Mark also presented testimony by the witness and the notary for Molly's signing of the quitclaim deeds and powers of attorney documents on October 20, 2017. They testified that Molly seemed coherent and not coerced. The notary specifically asked Molly if signing the documents was what she wanted to do, and she answered yes.

Greg and Mark also submitted evidence from Molly's physician that Molly was oriented and did not appear confused at her appointments between December 2016 and October 19, 2017, with the exception of October 18, when she was sleepy and difficult to arouse and could only give one-word responses. Molly's physician viewed Greg as a caregiver and did not perceive Greg as influencing Molly or making decisions for her.

Greg and Mark also called a medical expert. Like the medical expert for Molly's children and the special administrator, he had not observed Molly, but offered opinion testimony based on his review of evidence in the case. He testified that although Molly may have experienced brief temporary alterations in her level of consciousness and her abilities, her records and the depositions of those involved with her did not show that she lacked mental capacity or that she did anything without her free will at any specific date or time before October 21, 2017. Molly's medical records reflected a rapid deterioration of her condition starting on October 21, when she appeared confused, lethargic, and dazed.

### (b) Analysis

The parties disagree as to the governing standard of review, the burden of proof actually applied by the district court, and whether the district court erred by declaring the marriage

and the disputed financial transactions invalid on the grounds that Molly lacked the requisite mental capacity and was the victim of undue influence. We discuss each of these issues in the sections below, beginning with the standard of review.

### (i) Standard of Review

[3,4] An action for declaratory judgment is sui generis; whether such action is to be treated as one at law or one in equity is to be determined by the nature of the dispute. *Weyh v. Gottsch*, 303 Neb. 280, 929 N.W.2d 40 (2019). In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict and will not be set aside on appeal unless they are clearly wrong. *Cotton v. Ostroski*, 250 Neb. 911, 554 N.W.2d 130 (1996). An action in equity is reviewed by an appellate court de novo on the record. See *Mock v. Neumeister*, 296 Neb. 376, 892 N.W.2d 569 (2017). Offering little explanation, the parties to this appeal disagree about the nature of the dispute and, consequently, the standard of review. And, perhaps unexpectedly, Greg and Mark argue for a more deferential standard of review while Molly's children and the special administrator accept a less deferential one.

[5] Greg and Mark assert that this is an action at law and that therefore, we should review the evidence for clear error. Upon a review for clear error, an appellate court does not reweigh the evidence, but considers the judgment in a light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence. See *Cotton v. Ostroski, supra.* In a bench trial of an action at law, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Eicher v. Mid America Fin. Invest. Corp.*, 275 Neb. 462, 748 N.W.2d 1 (2008).

[6] On the other hand, Molly's children and the special administrator characterize this as an equitable action to be reviewed de novo. Under a de novo review, when credible evidence is in conflict on material issues of fact, an appellate

court will consider and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over another. See *Mock v. Neumeister, supra*.

It appears that both parties may be partially correct as to the appropriate standard of review, depending on the claim at issue. We have held, for example, that an action to annul a marriage, being an action in equity, is reviewed de novo. See *Edmunds v. Edwards*, 205 Neb. 255, 287 N.W.2d 420 (1980). We have also said that an action alleging undue influence in executing a deed conveying real property from sole ownership to joint tenancy with right of survivorship is one in equity. See *Anderson v. Claussen*, 200 Neb. 74, 262 N.W.2d 438 (1978). And we identified an action to enjoin a defendant from making claims on a life insurance policy on the grounds of undue influence as an equitable action and reviewed it de novo. See *Goff v. Weeks*, 246 Neb. 163, 517 N.W.2d 387 (1994). In *Cotton v. Ostroski, supra*, however, we reasoned that a change to a joint account was akin to a testamentary devise; therefore, the matter sounded in law, and we reviewed it for clear error. Other instruments involved in this case also arguably function like testamentary devises.

We conclude that it is not necessary for us to determine issue-by-issue whether the claims asserted are equitable and subject to a de novo standard of review or legal and properly reviewed for clear error. Even assuming all claims are properly reviewed de novo, which is more favorable to Greg and Mark, we conclude that the district court did not err in declaring the marriage and the disputed financial transactions invalid.

### (ii) Burden of Proof

Before addressing Greg and Mark's arguments that the district court erred by finding that Molly lacked the requisite mental capacity and was the victim of undue influence, we consider Greg and Mark's assignment of error concerning the burden of proof. They assert that the district court erred in applying a greater weight of the evidence burden of proof to this issue rather than a clear and convincing evidence standard.

In closing arguments, the parties agreed that Molly's children and the special administrator were required to prove their claims of lack of capacity and undue influence by clear and convincing evidence. The district court found in their favor on these issues. It expressly stated that it found the "witnesses [of Molly's children and the special administrator] credible and more credible than those called by [Greg and Mark]" and therefore "place[d] more weight on their testimony." Without expressly mentioning the burden of proof it had applied, the district court determined that Molly's children and the special administrator had met their burden as to lack of mental capacity and undue influence.

According to Greg and Mark, the district court's statement that it found the witnesses for Molly's children and the special administrator more credible than theirs and placed more weight on their testimony demonstrates that the district court deviated from a clear and convincing burden of proof and instead improperly applied a greater weight of the evidence standard. Clear and convincing evidence is evidence which produces in the trier of fact a firm belief or conviction about the existence of the fact to be proved, while a greater weight of the evidence standard means evidence sufficient to make a claim more likely true than not true. See *Burgardt v. Burgardt*, 304 Neb. 356, 934 N.W.2d 488 (2019); *Mock v. Neumeister*, 296 Neb. 376, 892 N.W.2d 569 (2017). Molly's children and the special administrator, as they did in the district court, accept that a clear and convincing burden of proof governs and contend that is the burden the district court applied.

As with our standard of review, we have tied the burden of proof in incapacity and undue influence cases to the nature of the cause of action. Generally, the burden of proof in an action at law is a greater weight of the evidence, and for an equitable action, the burden of proof is clear and convincing evidence. See *In re Estate of Price*, 223 Neb. 12, 388 N.W.2d 72 (1986). See, also, *Miller v. Westwood*, 238 Neb. 896, 472 N.W.2d 903 (1991). And as we observed in discussing the standard of

review, the nature of the cause of action for each of the various transactions involved in this case is not entirely clear. Again, the parties do not address this uncertainty, but again, it is not necessary for us to resolve it.

We see no indication that the district court held Molly's children and the special administrator to anything other than a burden to prove their claims by clear and convincing evidence, as the parties requested. The language upon which Greg and Mark rely does not speak to the burden of proof, but, rather, to witness credibility. The trier of fact's assessment of witness credibility goes to the weight to be given the testimony and is but a step in determining the ultimate question of whether a party has met the requisite burden of proof, whatever that may be. See *Schluter v. State*, 151 Neb. 284, 37 N.W.2d 396 (1949).

[7] In any event, the burden of proof applied by the district court is immaterial in this case. In a review de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions concerning the matters at issue. *In re Claims Against Pierce Elevator*, 291 Neb. 798, 868 N.W.2d 781 (2015). As the following analysis demonstrates, upon a de novo review, we find that clear and convincing evidence supported the district court's determinations concerning mental incapacity and undue influence.

### (iii) Undue Influence

Greg and Mark assign that the district court erred in finding that Molly was subject to undue influence when she executed the transactions in October 2017 that favored Greg and included Mark. In light of the evidence and the district court's credibility determinations, we disagree.

[8-10] The elements necessary to warrant the rejection of a written instrument on the ground of undue influence are (1) that the person who executed the instrument was subject to undue influence, (2) that there was opportunity to exercise undue influence, (3) that there was a disposition to exercise

undue influence for an improper purpose, and (4) that the result was clearly the effect of such undue influence. See *Miller v. Westwood, supra*. Because undue influence is often difficult to prove with direct evidence, it may be reasonably inferred from the facts and circumstances surrounding the actor: his or her life, character, and mental condition. *Goff v. Weeks*, 246 Neb. 163, 517 N.W.2d 387 (1994). Mere suspicion, surmise, or conjecture does not warrant a finding of undue influence; instead, there must be a solid foundation of established facts on which to rest the inference of its existence. *Mock v. Neumeister*, 296 Neb. 376, 892 N.W.2d 569 (2017).

Applying these principles here, we conclude upon our de novo review that there was clear and convincing evidence that Molly was subject to undue influence when she executed the October 2017 financial transactions. The evidence of Molly's children and the special administrator showed that Greg did not have a means of supporting himself. He had relied on Molly for his living expenses since 2009 and, to Molly's irritation, had a history of trying to treat Molly's assets as his own. She had also refused Greg's suggestion that she include Mark in her estate plan. Molly had consistently expressed, as late as September 2017, that she wanted the vast majority of her assets divided between her own children when she died and that she had arranged her finances and remained single with that goal in mind.

In October 2017, Molly's health deteriorated significantly. During this time, Molly experienced periodic delirium. Although no expert could pinpoint when the delirium occurred relative to the disputed transactions, Molly was subject to multiple possible causes of delirium during the relevant time, including fentanyl doses that lasted for 3 days. Jensen saw Molly frequently and noticed that she could not focus or make decisions during the last month of her life and that she did not recognize him when he visited her on October 10. On October 12, the bank manager who assisted with one of the disputed transactions opined that Molly did not have the strength to

do things on her own and did not appear to be acting of her own volition: Greg had to help Molly walk, did all of the talking, and held Molly's hand to help her sign the papers. The same day, Courtney spoke to Molly and could not understand her because her speech was garbled. A.J. too had difficulty understanding Molly in October 2017. Troilo similarly testified that she spoke to Molly once after September 2017 and that Molly was only able to respond "uh-huh" and "huh-uh."

The evidence indicates that as Molly's health deteriorated, Greg, either alone or in cooperation with his family, orchestrated a series of transactions to transfer the bulk of Molly's wealth to him upon her imminent death. The transactions coincided with Molly's inability to resist outside influence. They were executed in the presence of Greg and his family, who stood to benefit the most from the transactions. Greg and Mark would receive substantial assets, and Labart would no longer have to support Greg financially. By contrast, the transactions significantly diminished the interests of Molly's children, and until her death, the transactions were kept secret from her close friends and family, contact with whom Greg appeared to curtail during Molly's final days. The effect of the transactions was contrary to the wishes that Molly had unwaveringly expressed up until that point and that had previously governed her behavior.

Greg and Mark do not dispute there was evidence at trial to support this conclusion. Instead, they argue on appeal that evidence they presented as to Molly's wishes was more credible and entitled to more weight. We recognize that witnesses called and relied upon by Greg and Mark offered a much different narrative regarding Greg and Molly's actions in October 2017. Based on a meeting on October 6, they characterized Molly as an independent leader in a plan for her assets that the disputed transactions furthered. These witnesses called by Greg and Mark testified that Molly seemed coherent at the time the transactions were executed. Greg and Mark insist that these witnesses gave the most credible evidence on the subject and

that, in light of it, the district court was required to find a lack of undue influence. We disagree.

[11] Witness credibility and the weight to be given a witness' testimony are questions for the trier of fact. See *Huffman v. Peterson*, 272 Neb. 62, 718 N.W.2d 522 (2006). The evidence presented by the parties portrayed two very different accounts as to Molly's condition and actions in October 2017. The district court had the opportunity to observe the witnesses who testified firsthand and expressly determined that the witnesses for Molly's children and the special administrator were more credible than those called by Greg and Mark. We believe it appropriate to give weight to the district court's credibility finding, as we may even under a de novo review. See *Mock v. Neumeister*, 296 Neb. 376, 892 N.W.2d 569 (2017). Given the weight we give this credibility assessment and the evidence in the record summarized above, we conclude that the district court did not err in finding the October 2017 financial transactions invalid due to undue influence.

The district court and the parties all appear to assume that just as the financial transactions could be declared invalid if Molly's children and the special administrator demonstrated undue influence, so too could the marriage. That is not so clear to us. We do not appear to have ever held that a personal representative or special administrator of an estate has standing to seek the annulment of a decedent's marriage based on undue influence alone. Further, a majority of jurisdictions have held that an action to annul a marriage on the ground of fraud can only be brought by the defrauded spouse while both parties to the marriage are living. See *Morris v. Goodwin*, 230 Md. App. 395, 148 A.3d 63 (2016). This rule is based on the distinction between void and voidable marriages. *Id.* This court has recognized that distinction and has said that a marriage is merely voidable "when it has legal imperfections in its constitution which can be inquired into only during the lives of both of the parties." *Christensen v. Christensen*, 144 Neb. 763, 766, 14 N.W.2d 613, 615 (1944). We have described the doctrine

of undue influence as "not dissimilar to fraud." *In re Estate of Price*, 223 Neb. 12, 18, 388 N.W.2d 72, 77 (1986). And we are not aware of a statute providing that marriages procured by fraud or undue influence are void. Cf. Neb. Rev. Stat. § 42-103 (Reissue 2016).

Although we have questions about whether Molly's children or the special administrator have standing to seek the invalidation of the marriage based on undue influence alone, we need not resolve those questions here. There is no doubt that the marriage could be declared void if Molly was found to lack the requisite mental capacity. See § 42-103(2). See, also, *Edmunds v. Edwards*, 205 Neb. 255, 287 N.W.2d 420 (1980). And, as we will explain in the following section, we find the district court correctly concluded that Molly lacked the requisite capacity to marry Greg and complete the disputed financial transactions.

*(iv) Mental Capacity*

[12-15] The district court also declared the marriage and disputed financial transactions invalid on the grounds that Molly lacked the requisite mental capacity. In order to set aside an instrument for want of mental capacity on the part of the person executing it, the burden of proof is upon the party asserting incapacity to establish that the mind of the person was so weak or unbalanced when the instrument was executed that the person could not understand and comprehend the purport and effect of what he or she was doing. See *Dunbier v. Rafert*, 170 Neb. 570, 103 N.W.2d 814 (1960). Similarly, a marriage contract will not be declared void for mental incapacity to enter into it unless there existed at the time of the marriage such a want of understanding as to render a party incapable of assenting thereto. See § 42-103(2). See, also, *Edmunds v. Edwards, supra*. Mere weakness of mind is not sufficient unless there be such a mental defect as to prevent the party from comprehending the nature of the marriage contract and from giving free and intelligent consent to it. See

*id.* A marriage is valid if the party has sufficient capacity to understand the nature of the contract and the obligations and responsibilities it creates. *Id.*

Here, Molly's children and the special administrator presented clear and convincing evidence to show that Molly lacked the requisite mental capacity to marry Greg and execute the transactions in October 2017. There was ample evidence that until at least September 2017, Molly had consistently maintained that she would not marry again and that she intended to leave all of her assets to her children when she died, with the exception of remarking that she should probably leave Greg a relatively small amount. The marriage and the disputed transactions, which occurred between October 12 and 20, 2017, contravened these longstanding wishes and occurred at a time when, according to an expert for Molly's children and the special administrator, Molly experienced periodic delirium related to her illness and treatment. More than one of these causes, which included the 3-day doses of fentanyl, were likely affecting Molly simultaneously. Molly's delirium was evident to lay people. Jensen, who frequently visited Molly, observed that Molly lost the ability to focus and make decisions during the last month of her life, when the marriage and transactions occurred. Jensen testified that when he saw Molly on October 10, she did not know him. Two days later, the bank manager who assisted with adding Greg to Molly's bank accounts thought it did not seem "right" when he observed that Greg helped Molly walk, did all of the talking, and held Molly's hand so that she could sign the papers. No one disputes that by October 21, Molly was mentally incapacitated.

Greg and Mark make the same type of arguments with respect to mental capacity that they make regarding undue influence. Primarily, they argue that because their medical expert offered an opinion based on his review of Molly's medical records and deposition testimony that Molly did not lack mental capacity prior to October 20, 2017, and the expert called by Molly's children and the special administrator opined

only that Molly experienced periodic delirium prior to that date, their expert's testimony must be given more weight. We disagree. As we have noted, the district court expressly found that the witnesses called by Molly's children and the special administrator were more credible than those called by Greg and Mark. The opinion of Greg and Mark's medical expert was based, at least in part, on the deposition testimony of witnesses Greg and Mark called to testify at trial. We again believe it appropriate to give weight to the district court's credibility finding. See *Mock v. Neumeister*, 296 Neb. 376, 892 N.W.2d 569 (2017).

Given the district court's credibility assessment, the evidence of Molly's mental incapacity at the time of the marriage and disputed transactions, and the evidence that the marriage and disputed transactions ran contrary to the plans Molly consistently expressed to her friends and family through the years, we find that there was clear and convincing evidence that Molly lacked the capacity to marry Greg or complete the disputed financial transactions.

### 3. Acceptance of Benefits

After Greg and Mark filed their appeal, Molly's children and the special administrator filed a motion for summary dismissal. According to affidavits, Mark had taken possession of the boat at issue after the judgment, even though counsel for Molly's children and the special administrator had informed counsel for Greg and Mark that ownership of the boat would be an issue in any appeal. They argued that this constituted Greg and Mark's acceptance of the benefits of the judgment and merited dismissal of their appeal. We overruled the motion for summary dismissal but reserved the issue of acceptance of benefits until plenary submission on appeal. Having rejected the arguments raised by Greg and Mark's appeal, we need not address the contention that they waived their right to appeal by postjudgment actions related to the boat. See *Brumbaugh v. Bendorf*, 306 Neb. 250, 945 N.W.2d 116 (2020).

## 4. Resulting Trust for Boat

One matter concerning the boat remains. On cross-appeal, the special administrator assigns that the district court erred in declining to find that Mark held title to the boat as a trustee of a resulting trust and in imposing a burden on the special administrator to prove that the boat was not a gift from Molly to Mark. As we will explain, we conclude that the evidence shows the existence of a resulting trust and that any presumption of a gift was rebutted.

### (a) Additional Background

At trial, the parties presented evidence about the boat. Mark testified that Greg, Mark, and A.J. participated in finding a boat to purchase in Florida. It is undisputed that in 2014, Molly paid the entire purchase price of $119,000, though Greg signed the purchase agreement. Mark testified that shortly thereafter, Molly presented him with a title application and informed him that she was going to put his name on the title for the boat. According to Mark, Molly told him at that time that she wanted Mark's name on the title because A.J. did not know how to drive a boat. Mark's name was put on the title, and the boat remained in Florida, while Mark resided in Nebraska.

Mark confirmed that other than offering to pay for fuel while using the boat, he had not paid for insurance, maintenance, or any other major expenses. Insurance records for the boat listed Greg as the owner. Mark testified that he considered the boat to be his, but he let Molly and Greg use it whenever they wanted. Mark stated that he viewed the boat as a gift from Molly to him, but he did not report receiving a gift of that value on his tax returns or take deductions for depreciation of the boat. To Mark's knowledge, Molly did not give either of her children a similar gift during the same timeframe.

A.J. testified that the boat was titled in Mark's name for Molly's tax purposes because Mark did not own a second home like Molly did. According to A.J., Molly never indicated that the boat belonged to Mark; it was always A.J.'s understanding that the boat belonged to Molly.

According to Greg's deposition testimony, Molly put the boat in Mark's name so that Mark could claim it as a vacation home and deduct it on his taxes and because Mark, like Greg, held a specialized license to operate the boat, while Molly and her children did not. Greg explained that one of Molly's bank accounts was used principally for boat expenses.

As mentioned earlier, around the time Molly purchased the boat, she rejected Greg's suggestion that she include Mark in her estate plan, stating that Mark had a mother of his own for that. A friend of Molly's testified that the suggestion had caused tension between Greg and Molly and made Molly unhappy. Molly had also resisted paying for Mark and his wife to travel to Florida.

The district court determined that Molly's children and the special administrator had failed to establish the elements of a resulting trust and had not made the required showing that the boat was not a gift. Instead, the district court found that Molly initially put the boat in Mark's name for her own tax and financial advantage and did little to nothing to exert ownership thereafter. The district court noted that there were many possible reasons that Molly titled the boat in Mark's name, but refused to "engage in speculation regarding Molly's intent and plans for the boat."

### (b) Standard of Review

[16] Actions to declare a resulting trust are in equity. See *Washington v. Conley*, 273 Neb. 908, 734 N.W.2d 306 (2007). In an appeal in an equity action, it is the duty of this court to try issues of fact de novo upon the record and to reach an independent conclusion thereon without reference to the findings of the district court. *Biggerstaff v. Ostrand*, 199 Neb. 808, 261 N.W.2d 750 (1978).

### (c) Analysis

On cross-appeal, the special administrator admits that Molly titled the boat in Mark's name. However, he argues that the boat was not an unconditional gift from Molly to Mark and

that instead, Mark was holding the boat in a resulting trust for the benefit of Molly's estate. Mark counters that the evidence shows the opposite scenario and supports the district court's ruling on the issue.

[17-19] A resulting trust is one raised by implication of law and presumed always to have been contemplated by the parties; the intention of the resulting trust is to be found in the nature of their transaction, but not expressed in deed or instrument of conveyance. *Wait v. Cornette*, 259 Neb. 850, 612 N.W.2d 905 (2000); *Brtek v. Cihal*, 245 Neb. 756, 515 N.W.2d 628 (1994). Where a transfer of property is made to one person and the purchase price or consideration was paid by another person, a resulting trust arises in favor of the person who made the payment or provided consideration. See *id.* The court will impose a resulting trust when the circumstances surrounding a conveyance make it clear that the parties intended such a result. *Superior Hybrids Co. v. Carmichael*, 214 Neb. 384, 333 N.W.2d 911 (1983). The burden is on the one claiming the existence of a resulting trust to establish the facts upon which it is based by clear and satisfactory evidence. *Id*.

Upon our review of the evidence, we conclude that the special administrator met the burden of showing a resulting trust for the boat. The parties agree that Molly paid the purchase price for the boat and titled it in Mark's name, and the surrounding circumstances show that she intended a resulting trust. The rationale for a resulting trust is that individuals seldom give consideration to receive nothing. See *id.* And there was evidence that Molly titled the boat in Mark's name for purposes that benefited her. Mark himself testified that when Molly presented him with the title application, she said she wanted his name on the title because unlike A.J., Mark knew how to operate the boat. Further, A.J. suggested that Molly titled the boat in Mark's name for tax purposes. Greg's deposition testimony generally corroborated these motives. Finally, despite the boat's being titled in his name, Mark did not pay any of the major expenses associated with it, and Molly

maintained a bank account that was mainly used for paying boat expenses.

We have held that where a transfer of property is made to one person and another pays the purchase price in order to accomplish an illegal purpose, a resulting trust does not arise if the policy against unjust enrichment of the transferee is outweighed by the policy against giving relief to a person who has entered into an illegal transaction. *Lewis v. Poduska*, 240 Neb. 312, 481 N.W.2d 898 (1992), quoting Restatement (Second) of Trusts § 444 (1959). No one, however, contends that the arrangement concerning the boat was founded on an illegal purpose or presented evidence to that effect.

We have also said that a resulting trust may not arise when the parties are sufficiently close so as to give rise to a presumption that a gift was intended. See *Brtek v. Cihal*, 245 Neb. 756, 515 N.W.2d 628 (1994). The special administrator assigns that the district court erred in requiring proof that the boat was not a gift. Mark describes his relationship with Molly as sufficiently close to give rise to the presumption that Molly intended to gift the boat to him. We question whether this was the case. Mark was an adult when Greg and Molly began living together, and Greg and Molly were unmarried when the boat was titled in Mark's name. Where the parties' relationship is more remote than parent and child, courts generally do not presume a gift. See Ronald Chester et al., The Law of Trusts and Trustees § 460 (rev. 3d ed. 2005). This is because even where affection exists, the payor has no legal duty to support the grantee, and the inference that a gift was intended is not strong, especially where the payor has closer relatives than the grantee. *Id.*

Even assuming, without deciding, that Mark showed his relationship with Molly was sufficiently close to give rise to a presumption that Molly intended the boat as a gift to him, some of the same evidence that supports the existence of a resulting trust, along with other evidence, rebuts any presumption that the boat was a gift. See *Brtek v. Cihal, supra*. There was evidence that Molly resented the expectation that she should

pay for Mark's travel to Florida, and around the time Molly purchased the boat, she rejected Greg's suggestion that she include Mark in her estate plan, saying that Mark had his own mother from whose estate plan he could benefit. Mark admitted that to his knowledge, Molly made no gift that was similar to a boat to A.J. or Courtney, who were more natural recipients of such a substantial gift from Molly. Mark's position that the boat was a gift is further diminished by evidence that Mark's use of the boat was not exclusive and that Molly cited Mark's ability to operate the boat and tax purposes as reasons for titling it in his name. Finally, Mark did not pay taxes and maintenance costs for the boat.

Based on our conclusion that the special administrator met his burden of showing that Molly intended a resulting trust as to the boat and that the evidence rebutted any presumption of a gift, we reverse, and remand, in part, with directions to enter an order consistent with this opinion.

## V. CONCLUSION

For the foregoing reasons, we affirm the district court's findings and order regarding mental incapacity and undue influence, but in part reverse, and remand with directions to enter an order concerning the boat that is consistent with this opinion.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.